STATE EX REL. FARRELL, Petitioner, V. STOVALL, Chairman of the Board of Public Welfare and another, Respondents. [Two Cases.]

*Argued April 9, 1973.—Decided June 8, 1973.*
(Also reported in 207 N. W. 2d 809.)

152

For the petitioner there were briefs and oral argument by *Howard B. Eisenberg,* state public defender.

For the respondents the cause was argued by *Mary V. Bowman,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

WILKIE, J.   On this remand, two issues are raised by this petition for habeas corpus and declaratory judgment action.

1.   Do the equal protection requirements of the state and federal constitutions invalidate the sex deviate commitment proceedings under ch. 975, Stats., insofar as they fail to provide a jury trial, if requested, at either the initial commitment or subsequent commitment proceedings?

2.   Are any of the distinctions between mentally ill persons under ch. 51 and sex deviates under ch. 975, Stats., constitutionally permissible?

## 1. *The right to a jury trial.*

It is petitioner's essential contention that the Wisconsin Sex Crimes Law, ch. 975, Stats., denied him equal protection of the laws under the state and federal constitutions by failing to provide substantive and procedural safeguards substantially similar to those provided in the civil Mental Health Act.   Since the civil commitment statute, ch. 51, provides a jury determination if requested on the issue of mental illness or infirmity it is argued that ch. 975, also involving a type of mental illness, must similarly provide a jury determination of sex deviancy.   The failure of the Sex Crimes

Law to provide for a jury determination of sex deviancy either at his initial commitment proceedings or at subsequent renewal commitment proceedings violates, according to petitioner, his right to equal protection of the laws.

The Wisconsin Sex Crimes Law was first enacted in 1947 and provided a district attorney with authority to petition a court for commitment "[w]henever facts are presented . . . which satisfy him that good cause exists for judicial inquiry as to whether a person is a sexual psychopath." [5] The 1947 Act provided for a judicial determination of sex psychopathy, [6] and further provided a jury trial similar to that provided in the civil commitment section "[i]f a jury is demanded by the alleged sexual psychopathic person or by any relative or friend acting in his behalf." [7] The Sex Psychopath Act also provided that upon commitment as a sexual psychopath the provisions of the laws relating to the mentally ill were to become applicable. [8] These provisions included sec. 51.11, Stats., which provided a mentally ill person could at any time petition the judge of any court of record for re-examination as to his sanity. This statute further included the right to demand a jury trial on each of the re-examination petitions and the judge's order or determination in accordance with the jury verdict. [9]

In 1951 the legislature, while retaining the twofold purpose of the Act of protecting society from dangerous sex crimes and providing treatment for the sex offender, [10] significantly revised the Sex Psychopath Law, including a name change to the Sex Crimes Law and a

[5] Sec. 51.37 (2), Stats. 1947. *See generally*, Note, *Criminal Law—Wisconsin's Sexual Deviate Act*, 1954 Wis. L. Rev. 324.

[6] *Id.*

[7] Sec. 51.37 (4), Stats. 1947.

[8] Sec. 51.37 (6), Stats. 1947.

[9] Sec. 51.11 (5), Stats. 1947.

[10] *See* 1954 Wisconsin Law Review, *supra*, footnote 5, at page 325.

repositioning in the statutes to the chapter relating to criminal offenses against persons.[11] Other significant changes included a revision of the applicability of the Act's provisions to only those convicted of a sex crime. This portion of the Act mandated a presentence social, physical and mental examination upon conviction of specified sex crimes and permitted such examinations, in the committing court's discretion, upon conviction of any sex offense.[12] Significantly, the 1951 Sex Crimes Law deprived trial courts of any discretion in determining whether to order an individual to undergo "treatment for his mental and physical aberrations." Sub. (6) provided that upon the department's recommendation of specialized treatment the court had to either condition probation upon outpatient treatments or commit the person to the department. Effective judicial review of the department's recommendations was not required until the expiration of the maximum term provided by law for the particular offense and thereafter at five-year intervals.[13] One of the most significant of all the changes accomplished by the 1951 Sex Crimes Law was the elimination of the former Act's provisions relating to jury determinations of sex deviancy. Thus, the right of an alleged sex deviate to demand a jury at the initial commitment hearing and subsequent hearings on the necessity for the department's continued control over him were not transferred into the revised law.[14]

While the 1951 Sex Crimes Law has survived to this day with few legislative changes, it has given rise to a number of court challenges. The Act was upheld against

---

[11] Sec. 340.485, Stats. 1951. An excellent discussion of the Act is found in *Huebner v. State* (1967), 33 Wis. 2d 505, 521–526, 147 N. W. 2d 646.

[12] Sec. 340.485 (1) and (2), Stats. 1951.

[13] Sec. 340.485 (12), (13), (14), (15), Stats. 1951. This provision was modified in *Huebner v. State, supra,* footnote 11, at pages 528, 529.

[14] Sec. 340.485 (6), (12), Stats. 1951.

a constitutional due-process challenge by this court in *State ex rel. Volden v. Haas,*[15] but *Volden* was significantly modified thirteen years later on the same grounds in *Huebner v. State,* wherein a full independent judicial hearing "on the issue of the need for specialized treatment for his mental or physical aberrations" was held to be constitutionally required.[16] Although invited to expand the *Huebner* hearing to include a jury determination of sex deviancy if requested, this court, in *Buchanan v. State,*[17] declined to do so.

In *Buchanan* the court was asked to rule that considerations of due process and equal protection of the laws required an alleged sex deviate to have the same right to a jury trial as one alleged to be incompetent or mentally ill under ch. 51, Stats. Noting the equal-protection clause only requires some "valid distinction relevant to the purpose of the classification," this court concluded such distinctions did exist between the two Acts. According to the court:

"There are several germane distinctions to the classification, as seen above—the most important is that a sexual deviate is confined because he is dangerous to the public, and the mentally ill, infirm or deficient person is confined primarily for his own benefit and treatment." [18]

Finally, this court in *State v. Torpy* held the Act and its administration to be constitutionally sufficient against challenges to both the initial commitment criteria and subsequent continued commitment criteria of the department of health & social services.[19]

This is the history of the Wisconsin Sex Crimes Law which the instant petitioner seeks this court to again

[15] (1953), 264 Wis. 127, 58 N. W. 2d 577.

[16] *Supra,* footnote 11, at page 529.

[17] (1969), 41 Wis. 2d 460, 164 N. W. 2d 253.

[18] *Id.* at page 472.

[19] (1971), 52 Wis. 2d 101, 187 N. W. 2d 858.

consider with respect to the nature of the hearing involved in the initial commitment and subsequent recommitments of persons alleged to be sex deviates and in need of specialized treatment.

This court has considered the equal protection clauses of the state and federal constitutions and their dictates (in relation to sections of our criminal statutes) on at least two occasions during this term of court.[20] Thus, for example, in *State ex rel. Garner v. Gray* [21] and *State ex rel. Matalik v. Schubert*,[22] it was concluded that the essential determination is "whether there [is] an 'arbitrary discrimination' either in the statute itself or its application." [23] In *Matalik* it was held:

"... this court must determine whether some rational basis, justifying the difference in the rights afforded these two classes of persons who are alleged to be mentally ill, exists." [24]

The *Matalik* decision is also pertinent to the instant case because therein the court compared the Mental Health Act, which requires a jury trial if demanded on the issue of mental illness, to the competency-to-stand-trial provisions of sec. 971.15, Stats., not so requiring a jury determination, and concluded the two were "not dissimilar" in their definitions of mental illness and incompetency. The court further noted:

[20] The United States and Wisconsin Constitutions are similar with respect to the due process and equal protection clauses. *See, e.g., Pauly v. Keebler* (1921), 175 Wis. 428, 430, 431, 185 N. W. 554; *Boden v. Milwaukee* (1959), 8 Wis. 2d 318, 324, 99 N. W. 2d 156; *Lathrop v. Donohue* (1960), 10 Wis. 2d 230, 235, 102 N. W. 2d 404.

[21] (1972), 55 Wis. 2d 574, 201 N. W. 2d 163.

[22] (1973), 57 Wis. 2d 315, 204 N. W. 2d 13.

[23] *State ex rel. Garner v. Gray, supra,* footnote 21, at pages 586, 587. *See also: Baxstrom v. Herold* (1966), 383 U. S. 107, 111, 86 Sup. Ct. 760, 15 L. Ed. 2d 620.

[24] *State ex rel. Matalik v. Schubert, supra,* footnote 22, at pages 320, 321.

". . . As the right to a jury determination is a significant right accorded some who are alleged to be incompetent, it may not be arbitrarily withheld from others and yet meet the mandate of the equal protection clause." [25]

This court must, therefore, confront two issues in resolving the instant controversy. The first is whether the two Acts are properly comparable in the sense of dealing with the same group or class of persons. The second is whether a rational basis exists to justify the distinction in rights afforded between persons in such class or group.

On the question of whether ch. 51 and ch. 975, Stats., deal with the same or substantially similar classes of persons within the purview of the equal protection clause, it must be noted that the latter Act does not specifically define the illness it is concerned with. Sec. 975.06 (1) and (2) authorizes initial commitment for compulsory treatment if it finds a defendant is in need of "specialized treatment for his mental or physical aberrations." Sec. 975.14 authorizes renewal commitments if the court finds that a defendant's discharge would be "dangerous to the public because of the person's mental or physical deficiency, disorder or abnormality." These statutory criteria have been further elaborated by the department of health & social services. These criteria were outlined in *State v. Torpy,* and are:

"(1) Was the behavior of which the defendant was convicted the result of sexual psychopathology;
"(2) Is the defendant dangerous to society; and
"(3) Is he treatable, or will he not respond to treatment." [26]

---

[25] *Id.* at page 320.

[26] *Supra,* footnote 19, at page 114. *See also:* Comment, *The Special Review Board,* 1973 Wis. L. Rev. 172, 173; Comment, *Criteria for Commitment Under the Wisconsin Sex Crimes Act,* 1967 Wis. L. Rev. 980, for a fuller explication of the department's commitment criteria.

Ch. 51, on the other hand, defines mental illness as "mental disease to such extent that a person so afflicted requires care and treatment for his own welfare, or the welfare of others, or of the community." [27] Mental deficiency in the Mental Health Act is defined as "mental deficiency as defined by appropriate clinical authorities to such extent that a person so afflicted is incapable of managing himself and his affairs . . . ." [28] Commitment under this Act is authorized when the court or jury finds an individual is mentally ill, infirm or deficient *and* that he is a proper subject for custody and treatment. [29]

It is clear from a reading of these statutes that they are greatly similar in purpose and scope. While the Sex Crimes Law requires conviction of a sex offense as a precondition for commitment thereunder, both contemplate the "treatability" of the individual and an element of dangerousness to the public or himself if left untreated. Referring to the proposed revision of the Sex Crimes Law, the Citizens Committee, appointed by the Public Welfare Board in 1951, made the following observation:

"The Committee recognized that the sex crime problem is primarily a community problem. It was felt by the Committee that the best way of protecting the community is by treating the individual." [30]

[27] Sec. 51.75, Art. II (f), Stats. *See also:* sec. 51.005 (1), Stats., which provides: "(1) PURPOSE. It is the purpose of this chapter to provide for care and treatment in state and county hospitals for persons who by reason of mental illness, infirmity or deficiency are in need of care and treatment not feasible in their own homes or in private facilities."

[28] Sec. 51.75, Art. II (g), Stats.

[29] Sec. 51.02 (5) (c), Stats.

[30] Citizens Committee Report to the State Department of Public Welfare, April 20, 1951; files of the Legislative Reference Bureau, Call No. 346.21, W7a, at page 5.

Reiterating these goals, the committee made the following recommendation regarding the powers of the department:

". . . If the offender is committed to the Department, the Department is given wide powers to treat the individual and is required to discharge him only when it is satisfied that he may be discharged without danger to the public." [31]

This court has also recognized the dual purpose of the Sex Crimes Act in both *Huebner v. State* [32] and *Buchanan v. State.* [33] In *Buchanan* it was stated: "[t]he purpose of the Sex Crimes Act is to protect the public from the commission of dangerous sex crimes and to provide treatment for the dangerous sex offender." [34]

Recently, the United States Supreme Court has observed in ch. 51 commitments a purpose very similar to that of the Sex Crimes Law. Thus, in *Humphrey v. Cady* [35] it was noted that the chief purpose and scope of the civil commitment statute is treatment and protection of the individual and community from potential dangerousness. The United States Supreme Court stated:

". . . Like most, if not all, other states with similar legislation, Wisconsin conditions such confinement not solely on the medical judgment that the defendant is mentally ill and treatable, but also on the social and legal judgment that his potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty." [36]

---

[31] *Id.* at page 7.

[32] *Supra,* footnote 11, at page 521.

[33] *Supra,* footnote 17, at page 471.

[34] *Id.* See also: *State v. Torpy, supra,* footnote 19, at page 109.

[35] *Supra,* footnote 2.

[36] *Id.* at page 509.

It is therefore clear that the two Acts, the civil commitment statute and the sex crimes statute, are virtually identical in purpose and scope. While the *Buchanan* decision recognized the Acts were distinguishable in terms of their primary emphasis—the confining of the sex deviate chiefly due to the potential danger to the community, and the confining of the mentally ill person chiefly for his own benefit and treatment,[37] the pervading theme of both Acts is undeniably treatment of the individual and protection of the community.

In discussing the state's justification for distinctions in treatment between the two Acts, the high court in *Humphrey v. Cady* stated:

"An alternative justification for the discrimination might be sought in some special characteristic of sex offenders, which may render a jury determination uniquely inappropriate or unnecessary. It appears, however, that the Mental Health Act and the Sex Crimes Act are not mutually exclusive; that 'aberrations' warranting commitment under the latter might also amount to 'mental illness' warranting commitment under the former."[38]

The only meaningful difference between the two Acts, apart from the slightly different emphasis noted in *Buchanan,* is the sex crimes statute's inapplicability except where one's mental illness or "aberration" has already led him to the commission of a sex crime and conviction therefor.[39]

In addition to the similarities in purpose and scope of the two Acts, the judicial determinations of sex deviancy and mental illness or deficiency are quite similar. On this point, the United States Supreme Court, comparing

[37] *Buchanan v. State, supra,* footnote 17, at page 472.

[38] *Supra,* footnote 2, at page 512.

[39] These distinctions were referred to by the United States Supreme Court as "elusive." *Humphrey v. Cady, supra,* footnote 2, at page 512, note 8.

the Wisconsin Sex Crimes Law and the Mental Health Act, noted such similarity as follows:

"Since 1880, Wisconsin has relied on a jury to decide whether to confine a person for compulsory psychiatric treatment. Like most, if not all, other States with similar legislation, Wisconsin conditions such confinement not solely on the medical judgment that the defendant is mentally ill and treatable, but also on the social and legal judgment that his potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty. In making this determination, the jury serves the critical function of introducing into the process a lay judgment, reflecting values generally held in the community, concerning the kinds of potential harm that justify the State in confining a person for compulsory treatment.

"Commitment for compulsory treatment under the Wisconsin Sex Crimes Act appears to require precisely the same kind of determination, involving a mixture of medical and social or legal judgments. If that is so (and that is properly a subject for inquiry on remand), then it is proper to inquire what justification exists for depriving persons committed under the Sex Crimes Act of the jury determination afforded to persons committed under the Mental Health Act." [40]

While the United States Supreme Court specifically declined to rule on the issue of whether the determinations of sex deviancy and mental illness or deficiency are so substantially identical as to require a reasonable basis or justification for the lack of a jury determination under one Act while affording the right under the other, and remanded such issue to the trial court, we conclude that such judicial determinations are identical in nature.[41] As noted earlier, both statutes require for com-

---

[40] *Humphrey v. Cady, supra,* footnote 2, at pages 509, 510.

[41] The state public defender in his brief indicates he has been informed by the attorney general's office that the *Humphrey v. Cady* case will be dismissed shortly as moot on stipulation of the parties (Petitioner's Brief, at page 15).

mitment the determination, not only that a person is suffering from mental illness or deficiency (ch. 51, Stats.) or mental aberrations (ch. 975), but also that such person is a "proper subject for custody and treatment," [42] or is "in need of specialized treatment." [43] Further required by both statutes as a precondition to commitment, is a finding that the person alleged to be a sex deviate or mentally ill presents a danger to himself or the community.[44] Present, therefore, in both statutes is a weighing factor or "balancing test" that the person is sufficiently ill to present a danger to himself or the community and that he is in need of treatment.[45]

The statutes are virtually identical in scope and purpose and in the judgment requisite to involuntary commitments thereunder. Such being the case, it is necessary for this court to decide whether there exists "some rational basis for the distinction other than 'the arbitrary decision of the state to seek his commitment under one statute rather than the other.'" [46] Such justification, as pointed out by the United States Supreme Court in *Baxstrom v. Herold* [47] and *Humphrey v. Cady,* requires more than an individual's prior criminal record:

"... The court [in *Baxstrom*] recognized that the prisoner's criminal record might be a relevant factor in evaluating his mental condition, and in determining the type of care and treatment appropriate for his condition; it could not, however, justify depriving him of a jury determination on the basic question whether he was mentally ill and an appropriate subject for some kind of compulsory treatment." [48]

[42] Sec. 51.02 (5) (c), Stats.

[43] Sec. 975.06 (2), Stats.

[44] *See* footnotes 26 and 27, *supra,* and accompanying text.

[45] *See Lessard v. Schmidt* (D. C. Wis. 1972), 349 Fed. Supp. 1078, 1093.

[46] *State ex rel. Matalik v. Schubert, supra,* footnote 22, at page 320.

[47] *Supra,* footnote 23, at page 107.

[48] *Supra,* footnote 2, at page 508.

Some rational basis, therefore, must be found to justify the marked difference in rights afforded persons whose involuntary commitment is sought under these very similar commitment statutes.

With respect to the recommitment procedures of sec. 975.14, Stats., the state offers no justification for the explicit denial of the right to demand a jury determination which is afforded in sec. 51.11 (5) of the Mental Health Act. In *Humphrey v. Cady* the state had contended that sex deviate commitments were triggered by a conviction, and were therefore merely an alternative to penal sentencing which does not require the procedural safeguards afforded in the civil involuntary commitment statute. On this point the United States Supreme Court remarked:

". . . That argument arguably has force with respect to an initial commitment under the Sex Crimes Act, which is imposed in lieu of sentence, and is limited in duration to the maximum permissible sentence. *The argument can carry little weight, however, with respect to the subsequent renewal proceedings, which result in five-year commitment orders based on new findings of fact, and are in no way limited by the nature of the defendant's crime or the maximum sentence authorized for that crime.* The renewal orders bear substantial resemblance to the post-sentence commitment that was at issue in *Baxstrom.*" (Emphasis added.) [49]

Given the virtually identical purposes and scope of the two Acts, and the very similar judicial determinations requisite to involuntary commitment thereunder, no justification exists to deny the very important right to a jury trial in the sex deviate recommitment proceedings. The fact of a prior conviction has absolutely no relevance, as observed in *Humphrey,* to renewal proceedings which extend involuntary commitment beyond the maximum sentence authorized by law for the sex offense.

---

[49] *Id.* at pages 510, 511.

With respect to the initial commitment proceedings under the Sex Crimes Law, the state contends, as it did in *Humphrey,* that such commitments are merely penal sentence alternatives which do not require the procedural safeguards afforded in ch. 51, Stats. This distinction has been acknowledged as having some merit. Thus, for example, in *Humphrey v. Cady* the supreme court noted such argument "arguably has force" if, in fact, such commitments are merely alternatives to a penal sentence. Citing *Humphrey,* and analyzing in depth the question of whether incarceration as a sex deviate is a legitimate sentencing alternative not requiring additional procedural safeguards, is the very recent federal district court case, *Davy v. Sullivan.*[50] In *Davy,* a suit challenging the constitutionality of the Alabama Criminal Sexual Psychopath Statute, the district court emphasized the "characterization" of the sex deviate statute as a sentencing alternative or a separate, civil commitment proceeding. According to the court:

". . . If incarceration pursuant to a post-conviction proceeding is in lieu of a criminal sentence and is limited in duration to the maximum permissible sentence for that conviction, then such incarceration is in the nature of a sentencing alternative and the proceeding pursuant to which such incarceration is imposed is a mere sentencing proceeding not requiring even those procedural safeguards that are afforded in a civil commitment." [51]

It is therefore clear that the state's contention has received acknowledgment by various courts interpreting other state statutes.[52]

---

[50] (D. C. Ala. 1973), 354 Fed. Supp. 1320.

[51] *Id.* at page 1326.

[52] *See, e.g., Williams v. New York* (1949), 337 U. S. 241, 246–249, 69 Sup. Ct. 1079, 93 L. Ed. 1337. *But see Matthews v. Hardy* (D. C. Cir. 1969), 420 Fed. 2d 607, certiorari denied (1970), 397 U. S. 1010, 90 Sup. Ct. 1231, 25 L. Ed. 2d 423; *United States ex rel. Schuster v. Herold* (2d Cir. 1969), 410 Fed. 2d 1071, certiorari denied (1969), 396 U. S. 847, 90 Sup. Ct. 81, 24 L. Ed. 2d 96.

This court, however, has heretofore rejected the notion that sex deviancy commitments are merely an alternative to penal sentencing. In *Huebner v. State* we held unconstitutional administrative determinations of sex deviancy and involuntary commitment therefor and mandated a judicial hearing and determination of sex deviancy.[53] Responding to the contention that such commitments were mere sentencing alternatives, this court held:

"We consider this commitment procedure so essentially different from penal sentencing as to amount to an independent proceeding which determines such important rights of the defendant unrelated to the determination of guilt that due process requires a hearing thereon as much as it does for subsequent hearings on the same issue.

"We do not think the failure of the statute to provide a hearing in the first instance can be justified on any theory that such a commitment is only the equivalent of being penally sentenced for the maximum time provided by law for the crime plus a requirement for medical treatment. The Sex Crimes Act is not predicated upon any such theory. It forbids a penal sentence where treatment is recommended by the department and commands a commitment for mandatory treatment, *State ex rel. Copas v. Burke, supra,* and has been so understood, 49 Op. Atty. Gen. (1960), 64. Even release is not according to criminal law but under the provisions of the act." [54]

This "independent proceeding" observed in *Huebner* was further elaborated by the Federal District Court for the Western District of Wisconsin in *Hill v. Burke* as follows:

"The commitment proceedings under the statute constitute neither a civil commitment nor a sentencing procedure, but rather an *independent criminal proceeding* which is triggered by a criminal conviction." (Emphasis added.) [55]

---

[53] *Supra,* footnote 11, at page 526.
[54] *Id.*
[55] (D. C. Wis. 1968), 289 Fed. Supp. 921, 927, affirmed on appeal (7th Cir. 1970), 422 Fed. 2d 1195.

The sentencing alternative theory argument of sex deviate commitments proffered by the state has been rejected by this court in favor of viewing such commitments as independent of the convictions from which they arise. While some jurisdictions may regard their sex deviate procedure as a sentencing alternative, Wisconsin does not.

There are no further justifications for the radical differences in procedural safeguards which are afforded under the two Acts. While it is true that the emphasis of each Act is slightly different, recognizing that the sex deviate is more dangerous to the community than to himself, such difference in emphasis is the only meaningful distinction between the Acts. Manifestly, the Acts are not mutually exclusive and the civil statute could be utilized to commit a person who displays the definitional characteristics of a sex deviate but has not been convicted of a sex offense.

A majority of the court conclude that petitioner was unconstitutionally deprived of a jury determination on the question of his alleged sexual deviancy at his initial commitment. While petitioner in the instant case was not recommitted as a sex deviate pursuant to sec. 975.14, Stats., and, hence, the constitutionality of such procedure is not precisely before this court, it is equally clear that the explicit denial of the right to a jury trial therein cannot be constitutionally squared with the allowance of such right in ch. 51, if demanded. In *Huebner v. State* we required a judicial hearing on the determination of sex deviation in order to avoid constitutional attack on the Sex Crimes Law. In the instant matter, this court now requires jury determinations at both stages, initial commitment and recommitment, of the sex deviate proceedings.[56] Since ch. 51 requires only a six-man jury, if requested, such is all a person whose commitment is sought under ch. 975 is entitled to demand.

---

[56] *Supra*, footnote 11, at pages 528, 529.

Insofar as that case differs from what we decide here, *Buchanan v. State* is overruled.[57]

## 2. *The statutory distinctions between sex deviates and the mentally ill.*

Petitioner secondly contends that the United States Supreme Court's reference to *Jackson v. Indiana* invalidates several distinctions which exist between persons committed under the Sex Crimes Law rather than the Mental Health Act.[58] Thus, for example, it is contended that the burden of proof of sexual deviance as opposed to mental illness is less stringent; hearsay testimony is permissible in the sex deviate commitment and not in the mental health commitments; the standards of release are significantly greater under ch. 975, Stats., than under ch. 51; and, a greater right to subsequent judicial review is afforded under the civil commitment statute than under the sex crimes statute. Finally, petitioner contends the classification of persons as sex deviates creates a classification of individuals who are neither civilly nor criminally committed which is contrary to the *Jackson Case.*

With respect to the burden of proof requisite to the establishment of sexual deviancy and the permissibility of hearsay at such proceedings, this court has in this case established that persons alleged to be sex deviates have the same rights to demand a jury as do those persons whose involuntary commitment is sought under ch. 51, Stats. As has been noted, this mental health commitment statute requires "[t]he procedure shall be substantially like a jury trial in a civil action." [59] The same procedure must, to be consistent with the dictates of equal protection of the laws, apply under ch. 975 commitments.

[57] *Supra,* footnote 17, at pages 471, 472.
[58] *Supra,* footnote 3.
[59] Sec. 51.03, Stats.

The petitioner argues the standards of release under ch. 975, Stats., are significantly greater than under ch. 51. Sec. 975.11 provides "[t]he department shall discharge any such person as soon as in its opinion there is reasonable probability that he can be given full liberty without danger to the public . . . ."[60] Ch. 51, on the other hand, provides that the department must re-evaluate a person within six months of the initial re-evaluation and yearly thereafter in order to determine "whether such patient has made sufficient progress to be entitled to release or discharge . . . ."[61] The Act further requires the court to determine "that the patient is no longer in need of care and treatment" before releasing a committed person.[62] Rather than establishing a different standard of release in ch. 975, the statute simply describes with more particularity the criteria for release than does the Mental Health Act. It can hardly be argued that the appropriate authorities would permit a person committed as mentally ill to leave upon the "possibility" or "likelihood" that he has sufficiently recovered. Implicit in both chapters with respect to the standard of release is a weighing or balancing of the probabilities that the individual is not still in need of care and treatment.[63] Noted earlier was the basic similarity between the two Acts in terms of purpose, scope and the type of determination necessary to commitment.[64] It is these same standards which are applied when persons are re-examined. While the Sex Crimes Law specifically describes the standard of proof as a "reasonable probability" of recovery, this is also the standard utilized pur-

[60] Sec. 975.11, Stats.

[61] Sec. 51.075, Stats.

[62] Sec. 51.11 (5), Stats.

[63] *See Lessard v. Schmidt, supra,* footnote 45, at pages 1093, 1094.

[64] *Supra,* footnotes 27 and 41 and accompanying text.

suant to ch. 51. Therefore, petitioner's contention is without merit.

With respect to the final two contentions of petitioner, the prompt availability of judicial review and early release, and the classification created by ch. 975, Stats., of persons who are neither civilly nor criminally committed, it must be observed that the United States Supreme Court has not invalidated all distinctions which exist in a class or similar class of persons. Thus, in *Baxstrom v. Herold* it was noted:

". . . Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made. . . . Classification of mentally ill persons as either insane or dangerously insane of course may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given, but it has no relevance whatever in the context of the opportunity to show whether a person is mentally ill *at all*." [65]

While a sex deviate commitment is not simply a penal sentence and is an independent commitment, the fact yet remains that persons whose commitment is sought under ch. 975 have been convicted of a sex related crime. On this point it was stated in *Hill v. Burke* by the Federal District Court for the Western District of Wisconsin and as affirmed by the Seventh Circuit Court of Appeals on appeal (citing the district court decision in detail), which case involved the equal protection argument presently raised by the instant petitioner—foreclosure from periodic judicial review under the Sex Crimes Law but not under the civil commitment statute:

"An examination of the statutory scheme discloses that the legislature did not intend that the criminal conviction was to become entirely irrelevant. . . .

---

[65] *Baxstrom v. Herold, supra,* footnote 23, at page 111.

"The legislature has apparently concluded that the criminal conviction has some relevance to the determination of when an offender may be discharged without endangering the public. . . ." [66]

The district court further stated:

"The issue here is whether the offender can challenge his confinement once it has been determined after a hearing where he shall be confined. On this issue the legislature could have reasonably concluded, and evidently has concluded, that the conviction of a crime is a factor in determining whether an offender can be released without endangering the public.

"For the purposes of judicial reexamination and discharge, persons committed under sec. 959.15 can reasonably be distinguished from those committed under the Mental Health Act, for whom a criminal conviction does not act as a trigger to their commitment. This distinction is more difficult to sustain with regard to persons committed after acquittal by reason of insanity since the verdict of not guilty by reason of insanity presupposes the conclusion that the defendant committed the acts charged. . . . The legislature might reasonably conclude, however, that conviction for a sex crime indicates a greater threat to public security than does the commission of non-sex crimes.

"Petitioners also claim that sec. 959.15 differentiates unreasonably among those committed to the Department after conviction for a sex crime. They contend that their foreclosure from judicial reexamination until the expiration of the maximum term prescribed by law for the offense for which each was convicted deprives them of equal protection of the law in comparison with those convicted of different sex crimes and committed to the Department under sec. 959.15. In fact, Hill claims that he is deprived of equal protection in comparison with Boye since Boye is entitled to judicial reexamination after 15 years while Hill must wait 30 years before he is entitled to judicial reexamination. Petitioners' argument is that commitment to the Department under sec. 959.15 turns on the need for specialized treatment and,

---

[66] *Hill v. Burke, supra,* footnote 55, at page 927.

therefore, the maximum periods of confinement are not reasonably related to the purpose of the statute.

"A primary aim of commitment of sex offenders to the Department, however, is the protection of the public, as noted above. The legislature could reasonably conclude that the crime for which an offender is convicted has some bearing on the maximum duration of his confinement for the purpose of protection of the public. Sec. 959.15, therefore, does not differentiate unreasonably among those committed to the Department after conviction for a sex crime." [67]

The same reasons meet the instant petitioner's challenges.

Finally, with respect to petitioner's challenge to the nature of the sex deviate commitment, it must be observed that *Jackson v. Indiana* has not invalidated such commitments. While the court expressed concern over the drastically varying substantive limitations on the broad powers states have traditionally exercised over the mentally ill, including sexual psychopaths, it declined to address such questions:

"We need not address these broad questions here. It is clear that Jackson's commitment rests on proceedings that did not purport to bring into play, indeed did not even consider relevant, *any* of the articulated bases for exercise of Indiana's power of indefinite commitment." [68]

In the instant case, the articulated bases for the exercise of the state's power of commitment of persons found to be sexual deviates are twofold—the protection of the public and treatment for the individual. Since there is no allegation that these bases have been ignored with respect to petitioner's commitment as a sexual deviate, we are satisfied that the mandate of *Jackson v. Indiana* has been fulfilled.

---

[67] *Id.* at page 928.

[68] *Supra,* footnote 3, at pages 737, 738.

As in *Huebner v. State*,[69] the decision in this case is limited in its retrospective effect to the instant case and to cases pending (as to original commitment) wherein a report of the department of health & social services has not yet been filed in the trial court or has been filed but a hearing not held thereon. As to recommitment proceedings the decision in this case shall apply to the instant case and to other cases, now pending, wherein a hearing has not been held thereon. This decision shall additionally apply to any case wherein the court has held a hearing on the question of sexual deviancy, either original or a recommitment, where the jury issue was properly raised and preserved for appeal.

*By the Court.*—Declaration of rights as per decision herein; determination of petitioner's sexual deviancy stricken subject to the state's notification that such determination of sexual deviancy be made in a jury trial as requested by petitioner and as provided in this decision, such determination then to be made as of the time of the original determination; notification by the state to be made within thirty days of this order, notice thereof to be given to the circuit court for Outagamie county, which court shall conduct further proceedings hereunder, if any.

---

[69] *Supra*, footnote 11, at page 529.