STATE, Plaintiff-Respondent, v. HUNGERFORD, Defendant-Appellant.

*No. 76–529–CR. Argued June 7, 1978.—Decided 30, 1978.*
(Also reported in 267 N.W.2d 258.)

For the appellant there were briefs and oral argument by *Howard B. Eisenberg,* state public defender.

For the respondent the cause was argued by *Pamela Magee-Heilprin,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

HANLEY, J. Three issues are raised on this appeal:

1. Are statements made by a person in the course of treatment pursuant to his commitment under the Sex Crimes Act privileged and not admissible at a proceeding to determine the necessity of continued confinement under the Act?

2. Is evidence of a person's criminal record admissible at a hearing to determine the necessity of extending that person's confinement under the Sex Crimes Act?

3. Did the trial court err in instructing the jury?

*Privileged Communications*

Prior to the trial, the defendant sought an order from the trial court prohibiting the testimony of Dr. Casey and Mr. Warner to be admitted on the grounds that their testimony was subject to the physician-patient privilege of sec. 905.04(2), Stats. The trial court denied the defendant's request and the witnesses were allowed to testify.

The privilege which the defendant claims was violated by this ruling is set forth in sec. 905.04(2), Stats. This subsection provides:

"(2) GENERAL RULE OF PRIVILEGE. A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment of his physical, mental or emotional condition, among himself, his physician, or persons, including members of the patient's family, who are participating in the diagnosis or treatment under the direction of the physician."

Neither party to this appeal is concerned with the initial applicability of this section to the communications disclosed by these witnesses; rather, they direct their arguments primarily to whether the privilege was inoperative with respect to the type of hearing here in question by reason of sec. 905.04(4)(a), Stats. There it is provided:

"(4) EXCEPTIONS. (a) *Proceedings for hospitalization.* There is no privilege under this rule as to communications and information relevant to an issue in proceedings to hospitalize the patient for mental illness, if the physician in the course of diagnosis or treatment has determined that the patient is in need of hospitalization."

If the defendant's Sex Crimes Act recommitment hearing was a "proceeding for hospitalization" within the meaning of this provision, his communications to these therapists would not be inadmissible by reason of the privilege.

The defendant argues that this exemption was intended to suspend the privilege only with respect to an initial commitment proceeding, not with respect to subsequent proceedings to determine the necessity of continued hospitalization. In support of this argument, he notes that the Wisconsin rule was modeled on the corresponding Proposed Federal Rule of Evidence 504(d) (1), and that the Federal Advisory Committee Note to this section indicates that it was intended to exempt from the privilege disclosures made to a "person in whom the patient has already manifested confidence." *Wisconsin Rules of Evidence*, 59 Wis.2d R128–29 (1973). Those who are treating a patient who has been committed under the Act are not, the defendant claims, such persons in whom the patient has manifested confidence. *See,* Goldstein and Katz, "Psychiatrist-Patient Privilege: The GAP Proposal and the Connecticut Statute," 36 Conn. B.J. 175, 186–87 (1962).

Assuming that this was the intent of the proposed Federal Rule, we are not convinced that the Wisconsin privilege exemption was intended to be applied in the same narrow manner. First, we note that the Wisconsin exemption is not expressly dependent on the type of relationship between the physician and patient, but rather is directed to a particular proceeding. Second, we do not think that the various Committee notes to this provision unambiguously support the defendant's claim that the privilege is suspended only with respect to a proceeding for initial commitment. The Wisconsin Judicial Council Committee's Note to sub. (4) (a) specifically cites former sec. 885.21 (1) (b), Stats., to support the statement that "Wisconsin is in accord" with the Proposed Federal Rule as expanded to physicians generally. *Wisconsin Rules of Evidence,* 59 Wis.2d R128 (1973). Under this section, a physician was not permitted to disclose information obtained in the course of treating a patient, except "[i]n all

lunacy inquiries." *See,* sec. 885.21(1) (b), Stats. (1971). Finally, with respect to determining what is meant by "proceedings for hospitalization," we note that the initial Sex Crimes Act Commitment procedure is similar to the recommitment procedure in two significant respects. Both proceedings are designed to protect the public from the danger posed by the sexual deviate. *Buchanan v. State,* 44 Wis.2d 460, 472, 164 N.W.2d 253 (1969) ; *see also, State ex rel. Farrell v. Stovall,* 59 Wis.2d 148, 162, 207 N.W.2d 809 (1973). In both, the hearing is held in order to determine whether the department's conclusion that commitment is necessary, is itself justified. *See,* secs. 975.06(1) (a) and 975.14, Stats.

This court has consistently strictly interpreted privileges and confidentialities granted by statute. *Davidson v. St. Paul Fire & Marine Insurance Co.,* 75 Wis.2d 190, 197, 248 N.W.2d 433 (1977), and cases cited therein; *Alexander v. Farmer's Mutual Automobile Insurance Co.,* 2 Wis.2d 623, 628, 131 N.W.2d 373 (1964). In light of the above, we conclude that sec. 905.04(4) (a), Stats., which permits the admission of "communications and information relevant to an issue in proceedings to hospitalize the patient for mental illness," is not so narrow as to be applicable only to the proceeding which may result in the patient's initial institutionalization. Therefore, the trial court did not err in admitting the testimony of therapists who had treated the defendant at Central State Hospital.

*Admissibility of Defendant's Criminal Record*

The defendant also contends that the trial court erred when, in a pretrial ruling, it held that evidence relating to the defendant's criminal record would be admissible.

This issue concerns the testimony of two of the state's witnesses, Dr. Casey and Dr. Crowley. After relating certain events which occurred during her supervision of

the defendant's treatment at Central State Hospital, Dr. Casey stated that the defendant was suffering from a personality disorder and that he had a poor ability to tolerate any frustrations. In Dr. Casey's opinion, the defendant was impulsive and lacked control over his behavior. She concluded that the defendant was a sex deviate and based this conclusion, in part, on the defendant's criminal history. Dr. Casey then testified as follows:

"Q. Now, is there anything in that past history that's important in forming your opinion?

"A. Yes, he has committed a number of sexual deviate acts, sex offenses.

"Q. Will you tell the jury what those were?

"A. The first one that Elmer shared in group was when he was twelve years old, he sexually attacked a school teacher. Then when he was eighteen—

" . . .

"Q. Were there any other incidents in Mr. Hungerford's history?

"A. Yes, there are numbers starting when he was eighteen.

"Q. Would you tell the jury?

"A. He has more or less a continuous record of incidents.

"Q. We are just interested in sexual.

"A. Yes, incidents, exposures, masturbation, exposing himself in front of women and indecent behavior with children, little girls.

"Q. How many?

"A. About a dozen convictions.

"Q. So there might be incidents where he wasn't convicted?

"A. Yes.

"Q. And when do those convictions start and when do they end?

"A. They started when he was eighteen years old, 1947 and he was in Winnebago, when he was at Green Bay Reformatory and they go more or less continuously.

"Q. When did they end? When were the last convictions?

"A. The last convictions were 1971 when he was committed to Central State Hospital.

" . . .

"Q. How many convictions were there for indecent behavior with children?

"A. Well, some of them are indecent exposure and most of them are indecent liberties with children, I could [sic] four.

The second witness called by the state was Dr. Crowley, a psychiatrist who examined the defendant at the defendant's request. Dr. Crowley stated that based upon his examination of the defendant and his review of the defendant's hospital records, the doctor was of the opinion that the defendant was "sexually deviated and that his specific deviation [was] pedophilia." Dr. Crowley stated that he formed this opinion in substantial part on the defendant's hospital record. The doctor then testified as follows:

"Q. And was there any part of that history that perhaps the jury should know that you relied on in forming your opinion?

"A. Well, just in a previous recounting, I noted that as early as 1947, although I can't do the arithmetic, my recollection was, told me—He told me he was just almost an adult at the time, actually an adolescent and had a history of indecent exposure to children and then in 1958, exposure, exhibition, 1959, indecent exposure,— 1951, exposure and attempting intercourse with an adult, 1952, exhibition, 1953, listed as attempted rape, 1954, attempted assault, fourteen years old, masturbating in front of an eleven year old, 1959, fornication and indecent exposure with a nine year old, 1963, indecent liberties with a female and then the most recent events in the filling station where Mr. Hungerford had been working prior to his most recent incarceration."

The defendant bases his arguments on this issue, as well as the last issue relating to instructions, on the threshold proposition that the proper focus of inquiry in a hearing to determine the necessity of continuing the

defendant's treatment is not found in ch. 975, the Sex Crimes Act, but rather in ch. 51, the Mental Health Act. In sec. 975.14(2), Stats., it is provided that the court shall confirm the order of the department extending a defendant's treatment under the Sex Crimes Act if, after a hearing, "it is found that discharge from the control of the department of the person to whom the order applies would be dangerous to the public because of the person's mental or physical deficiency, disorder abnormality . . . ." This chapter does not expressly define what is meant by "dangerous to the public because of mental or physical deficiency, disorder or deficiency," and therefore the defendant argues the meaning is established by ch. 51. The defendant supports this proposition with both a statutory construction analysis and equal protection argument.

It has long been stated that the Sex Crimes Act has two basic purposes: (1) to protect society from dangerous sex crimes, and (2) to provide treatment, as opposed to mere punishment, to the dangerous sex offender. Note, 1954 *Wis. L. Rev.* 324, 325. In *Buchanan v. State, supra,* this court noted an important distinction between those committed under the Sex Crimes Act and those committed under the general civil commitment statute: "A sexual deviate is confined because he is dangerous to the public, and the mentally ill, infirm or deficient person is confined primarily for his own benefit and treatment." That the purpose of protecting society is a basis of recommitment as well as initial commitment under the Sex Crimes Act was made clear in *State v. Torpy,* 52 Wis.2d 101, 111–12, 187 N.W.2d 858 (1971).

Moreover, in *Torpy* this court indicated that the Sex Crimes Act was intended to protect the public from the danger of psychological as well as physical harm posed by the sexual deviate. In *Torpy,* the defendant chal-

lenged his recommitment under the Act on the grounds that the standards for recommitment were too vague. The court disagreed, reasoning that the statutory standard for recommitment was not simply "dangerous" but rather "dangerous to the public because of the person's mental or physical deficiency, disorder or abnormality." *State v. Torpy, supra* at 115–16. Furthermore, the court clearly indicated that the danger to society required by the statute went "beyond the question of whether the defendant would or would not resort to violence" to include situations where there was a likelihood that a defendant, upon release, "would seek out minors and impose himself upon them in hopes of establishing a homosexual relationship." *State v. Torpy, supra* at 116.

"An offender whose deviant sexual conduct is directed towards others to their physical or moral harm should be regarded as dangerous. If his crime involved violence or aggression, or if there was an age disparity between the offender and his adolescent victim, the offender should be considered dangerous . . . The taking of indecent liberties with preadolescent children often produces serious psychological problems later in life." Comment, "Criteria for Commitment Under the Wisconsin Sex Crimes Act," 1967 *Wis. L. Rev.* 980 at 984–85, quoted in part in *State v. Torpy, supra* at 117.

Thus, it was decided that the statutory standard for recommitment under the Sex Crimes Act—that the person was "dangerous to the public because of the person's mental or physical deficiency, disorder, or abnormality" —was not prohibitively vague and included the danger of causing psychological harm to the public.

The defendant contends, however, that by subsequently amending ch. 51, Stats., the Mental Health Act, the legislature intended to provide those committed under the Sex Crimes Act with reexamination hearings substantively identical to those provided to persons committed under the Mental Health Act.

The keystone to the defendant's argument is sec. 51.-20(17)(j) (1975), which states: "This subsection [*i.e.,* sec. 51.20(17)] applies to petitions for reexamination which are filed pursuant to chs. 971 and 975." One part of subsec. 51.20(17) provides: "Subsections (11) to (14) shall govern the procedure to be used in the conduct of . . . [the reexamination] hearing insofar as applicable." Sec. 51.20(17)(g), Stats. Section 51.20(14)(g), in turn, provides in pertinent part that a patient's treatment shall be continued if the court determines that the individual is a proper subject for commitment as prescribed in subsec. 51.20(1)(a), Stats. This last subsection describes the criteria for commitment or recommitment under the Mental Health Act as follows:

"51.20 Involuntary commitment for treatment. (1) PETITION FOR EXAMINATION. (a) Every written petition for examination shall allege that the subject individual to be examined:

"1. Is mentally ill, drug dependent, or developmentally disabled and is a proper subject for treatment; and either

"2. Is dangerous because of:

"a. A substantial risk of physical harm to the subject individual as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm; or

"b. *A substantial risk of physical harm to other persons as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do such physical harm;* or

"3. Evidences a very substantial risk of physical impairment or injury to the subject individual, as manifested by evidence that his or her judgment is so affected that he or she is unable to protect himself or herself in the community and that reasonable provision for his or her protection is not available in the community and the individual is not appropriate for place-

ment under s. 55.06. The subject individual's status as a minor does not automatically establish dangerousness under this subparagraph." (Emphasis supplied.) Sec. 51.20 (1) (a), Stats.

By following this chain of interrelated statutory subsections, the defendant contends that a recommitment proceeding for one originally committed under the Sex Crimes Act is governed by the criteria set forth in civil commitment statute. Moreover, because subsec. 51.20 (1) (a), Stats., defines "dangerous" in terms of the risk of *physical harm* to others, the defendant argues that the legislature intended to neutralize this court's previous conclusion in *State v. Torpy, supra,* that risk of *psychological harm* to others could warrant a commitment extension under the Sex Crimes Act.

Upon this statutory analysis, the defendant bases his arguments with respect to the issues concerning the admissibility of the defendant's criminal record and the trial court's instructions to the jury. With respect to the former, the defendant argues that because sec. 51.20 (1) (a) requires "evidence of recent homicidal or other violent behavior" or evidence of "a recent overt act, attempt or threat to do . . . physical harm," evidence of his record of past convictions for generally non-violent sex crimes was irrelevant, immaterial and highly prejudicial.

If only the current language of the statutes is considered, the defendant's statutory analysis would appear to be valid. However, upon closer inspection, we conclude that the defendant's underlying proposition—that a Sex Crimes Act recommitment proceeding held under secs. 975.13 and 975.14, Stats., is subject to the criteria set forth in sec. 51.20 (1) (a), Stats.—is without merit. This conclusion is substantiated by the legislative history of current ch. 51 and by the language of the relevant statutes themselves.

First, the 1975 enactment of current ch. 51 was prompted by the decision in *Lessard v. Schmidt*, 349 F. Supp. 1078 (E.D. Wis. 1972). In *Lessard*, the plaintiff brought a class action contesting the validity of Wisconsin civil commitment procedures then in effect. *See e.g.*, secs. 51.0–51.075, 51.11, 51.13, Stats. (1971). The plaintiff argued that the involuntary commitment procedure denied her due process of law in several respects. In a lengthy opinion, a three member court assessed these aspects of the procedures then utilized in involuntary civil commitment proceedings and concluded that they were indeed constitutionally defective.

Thereafter, the 1975 involuntary commitment statutes were enacted with provisions specifying that any person who is the subject of such a proceeding has the right to notice, sec. 51.20(10)–(11); the right to a speedy hearing to determine probable cause for commitment, sec. 51.20(8)(a); the right under most circumstances to a full commitment hearing within two weeks of being taken into custody, sec. 51.20(8)(c); the right to counsel, sec. 51.20(4); the right against self incrimination, sec. 51.20(10)(a); the right to require the party seeking commitment to prove the elements therefor beyond a reasonable doubt, sec. 51.20(14)(e); and the right to be committed to only that degree of supervision as is necessary for effective treatment, sec. 51.20(9), (10) (b) and (14). The amendments further provided that such a person enjoys the right of being committed only after it is sufficiently demonstrated that he or she is mentally ill, and dangerous to others or to him or herself. Sec. 51.20(1)(a), (14)(a), Stats.

It is clear, however, that not all of the statutory provisions relating to the reexamination of a patient committed under the amended Mental Health Act were intended to be applied to a sex deviate's recommitment

hearing under sec. 975.13, Stats. For example, a petition for reexamination brought by a patient who has been civilly committed is properly filed with "the branch of the county court which handles probate matters, either in the county from which the patient is committed or in the county in which the patient is detained." Sec. 51.20(17)(b), Stats. However, the Sex Crimes Act clearly states that an application to review the department's order extending control shall be made to "the committing court." Secs. 975.13–975.14, Stats. Under the civil commitment statutes, a patient may compel by petition a reexamination hearing after 120 days have passed since his initial commitment, sec. 51.20(17)(c), and may compel by petition subsequent hearings after 120 days have passed since the previous hearing. Sec. 51.20(17)(i), Stats. Under the Sex Crimes Act, on the other hand, a defendant is entitled during the initial period of commitment to review the necessity of his continued treatment only when the department conducts its annual examination of him, sec. 975.09, Stats; *State ex rel. Terry v. Schubert,* 74 Wis.2d 487, 247 N.W.2d 109 (1976), and when the department orders the extension of his commitment beyond the maximum term for the offense for which he was committed, secs. 975.12–975.14, Stats. If his commitment is extended, the defendant is then entitled to apply to the court for a reexamination on a semi-annual basis, sec. 975.15(3), Stats., and even if he does not do so, the necessity of his continued treatment must be reviewed within 5 years of the previous order extending treatment. Sec. 975.15(1), Stats.

Thus, viewed strictly as a matter of statutory construction, it is clear that the legislature did not intend all of the provisions of the civil commitment statute relating to the reexamination of a civilly committed person to apply to hearings for the extension of control over a sexual deviate. Indeed, in sec. 51.20(17)(g), the legislature said as much: "Subsections (11) to (14) [which

includes the reference to the statutory definition of danger] shall govern the procedure to be used in the conduct of . . . [a reexamination] hearing, *insofar as applicable.*" (Emphasis supplied.)

Moreover, with respect to the question of what standard must be met to extend control over one committed under the Sex Crimes Act, it is instructive that the legislature did not modify that language which, in *State v. Torpy, supra,* this court found to include the danger of psychological harm to the public. The legislature's failure to do so is particularly telling inasmuch as ch. 975 was also the subject of legislative amendment in 1975.[1]

This court has consistently followed the rule that "[t]he legislature is presumed to know that in the absence of its changing the law, the construction put upon it by the court will remain unchanged . . ." *Zimmerman v. Wisconsin Electric Power Co.,* 38 Wis.2d 626, 634, 157 N.W.2d 648 (1968). *See also, Milwaukee Federation of Teachers, Local No. 252 v. WERC,* 83 Wis.2d 588, 598, 266 N.W.2d 314 (1978) ; *In re Estate of Haese,* 80 Wis.2d 285, 294, 259 N.W.2d 54 (1977) ; 2A Sutherland, *Statutory Construction,* §45.12 at 37 (4th ed., Sands, 1973). This is especially true in those situations where the legislature has enacted legislation in an area covered in part by other, previously enacted statutes:

---

[1] 1975 Wis. Laws, ch. 155. This amendment provided for a jury trial in the procedures to commit, sec. 975.06, and recommit, sec. 975.14, convicted defendants for special treatment under the Sex Crimes Act. The amendment was prompted by *State ex rel. Farrell v. Stovall,* 59 Wis.2d 148, 207 N.W.2d 809 (1973), wherein this court held, on equal protection grounds, that procedures for commitment and recommitment under the Sex Crimes Act must afford the same right to jury trial as are available to those subject to civil commitment proceedings. *See,* Legislative Council Note, 1975, at sec. 975.06, Stats. (1975).

"[I]t is assumed that whenever the legislature enacts a provision it had in mind previous statutes relating to the same subject matter, wherefore it is held that in the absence of any express repeal or amendment therein, the new provision was enacted in accord with the legislative policy embodied in those prior statutes, and they should all be construed together." 2A Sutherland, *Statutory Construction*, §51.02 at 290 (4th ed., Sands, 1973).[2]

Finally, the defendant argues that the concept of dangerousness contained in sec. 51.20, Stats., is applicable to Sex Crimes Act reexamination hearings because of our decision in *State ex rel. Gebarski v. Milwaukee County Cir. Ct.*, 80 Wis.2d 489, 259 N.W.2d 531 (1977). In *Gebarski* the court was asked to determine whether those who have been committed following acquittal by reason of mental disease or defect under sec. 971.17, Stats., are entitled to a jury trial on reexamination. The court concluded that they were after a two step analysis: first, the court recognized that under sec. 51.20 (17), petitions for reexamination brought by one committed under ch. 971 were to be generally governed by the procedures set forth in sec. 51.20, Stats.; second, the court concluded, after a lengthy historical examination, that the provisions of sec. 971.17, itself, were not contrary to the civil commitment jury trial procedure. The defendant is correct in asserting that the relationship between sec. 971.17 and sec. 51.20 is similar to that between sec. 975.13 and sec. 51.20. However, unlike *Gebarski*, the provisions of ch. 975 are inconsistent with sec. 51.20 insofar as the concept of danger is concerned.

[2] In this respect, it is interesting to note that the type of physical harm the defendant considers necessary for commitment or recommitment under sec. 51.20(1)(a), Stats., is not necessarily an element of those crimes for which a presentence examination for commitment under the Sex Crimes Act is mandatory. *See*, sec. 975.01, Stats. (1975); sec. 940.225(1)–(3) and (5)(h), Stats. (1975).

■
We conclude that the defendant's underlying premise to these two issues—that the concept of physical danger contained in sec. 51.20(1)(a) governs Sex Crimes Act recommitment hearings—is not, upon a statutory analysis, valid.

■
The defendant also contends that it is a denial of equal protection to apply a different standard of dangerousness to one committed under the Sex Crimes Act than to one civilly committed.

In *State ex rel. Farrell v. Stovall*, 59 Wis.2d 148, 207 N.W.2d 809 (1973), similar arguments were raised with respect to various differences in the procedures for commitment and continuation of control between the then applicable Sex Crimes Act and civil commitment statute. Determining that the two acts were properly comparable in the sense of dealing with the same group or class of persons, *State ex rel. Farrell v. Stovall, supra* at 159–64, the court then looked to see if the variations in procedure were reasonably justified. The court found no justification for the explicit denial in sec. 975.14, Stats. (1971) of the right to demand a jury trial upon recommitment which was afforded under sec. 51.11(5), Stats. (1971). *State ex rel. Farrell v. Stovall, supra* at 165. In other respects, the court rejected the petitioner's equal protection argument principally for the reason that the Sex Crimes Act commitment was triggered by a conviction for a sexually related crime. To support the conclusion that such a conviction reasonably justified variations in the procedures for discharge, the court extensively quoted *Hill v. Burke*, 289 F. Supp. 921, 927–28 (E.D. Wis. 1968), affd., 422 F.2d 1195 (7th Cir. 1970), where it was stated:

"The legislature has apparently concluded that the criminal conviction has some relevance to the deter-

mination of when an offender may be discharged without endangering the public. This conclusion is not unreasonable and it serves to distinguish the reexamination proceedings from the commitment proceedings and to distinguish the right to judicial reexaminations under the Mental Health Act from the alleged right to judicial reexaminations under the Sex Deviate Act.

"The determination in the commitment proceedings is not whether the offender should be incarcerated at all, but whether he should be imprisoned or committed to the Department for treatment. On this issue the conviction of a crime does not come into play. It merely triggers the inquiry.

"The issue here is whether the offender can challenge his confinement once it has been determined after a hearing where he shall be confined. On this issue the legislature could have reasonably concluded, and evidently has concluded, that the conviction of a crime is a factor in determining whether an offender can be released without endangering the public."

The conclusion in *Farrell* that a criminal conviction is a reasonable justification for disparities in procedures for release between the Sex Crimes Act and other commitment statutes was most recently affirmed in *State ex rel. Terry v. Schubert, supra.* In *Terry,* the petitioner argued that persons committed under ch. 975 were denied equal protection because persons committed under other statutes were provided with greater rights of judicial review. On a purely equal protection basis, the court rejected this contention, stating:

"Thus, we follow the conclusion in *State ex rel. Farrell v. Stovall, supra,* that the fact a person committed under ch. 975 has been convicted of a crime constitutes a rational basis for the disparity in the judicial reexamination procedures provided persons so committed and persons committed under other statutory provisions. Since there exists a rational basis which justifies this disparity, it is determined that petitioner is not denied equal protection." *State ex rel. Terry v. Schubert, supra* at 501–02.

Again, the justification was found in the legislature's primary and distinguishing aim under the Sex Crimes Act of protecting the public.

The defendant attempts to distinguish *Terry* and *Farrell* on the grounds that those cases involved persons who were still serving under the commitment the time they would have served in a penal institution if sentenced under the criminal code. Here, the defendant claims he has been committed for a period equal to that for which he could have been sentenced, and that for this reason, a prior sex crime conviction no longer reasonably justifies the disparity in standards for release.

However, we note that the defendant's claim that he has been committed under the Act for as long as he could have been sentenced is not supported by the record. Hungerford was convicted on August 2, 1971 of two counts of indecent behavior with a child, in violation of sec. 944.11(1) and (3), Stats. (1971). *See, State v. Hungerford,* 54 Wis.2d 744, 196 N.W.2d 647 (1972). The maximum sentence the defendant could have received for each conviction was ten years. Sec. 944.11, Stats. (1971). Under the Sex Crimes Act, the department is not required to seek judicial review of its order to retain control over the defendant until "the expiration of the maximum term prescribed by the law for the offense for which he was committed," less that amount of good time earned under the provisions of secs. 53.11–53.12, Stats. Sec. 975. 12, Stats.

On oral argument, the public defender stated that the defendant was confined under the original order for commitment until July, 1976, except for a brief period during which "he was in escape status." It does not appear, therefore, that the defendant has been committed for a period of time equal to the maximum term for which he could have been sentenced. The defendant's claim, therefore, is apparently founded upon the fact

that the department prematurely issued an order extending his commitment, and sought review of that order, in July, 1976. The record indicates that the department was under the belief that the defendant's original term of commitment would expire in December, 1976. Nevertheless, a computation error on the part of the department does not change the defendant's legal status under the Sex Crimes Act so as to distinguish *Farrell* and *Terry* as urged.

Moreover, even if the defendant had been committed for a period equal to that of the maximum possible sentence, the fact that the defendant has been convicted of a sex related crime continues to be a rational basis for applying a standard for discharge different from that applied in civil recommitment cases. As the district court stated in *Hill v. Burke, supra* at 927, "An examination of the statutory scheme discloses that the legislature did not intend that the criminal conviction was to become entirely irrelevant. The purposes of the statute are to protect society from dangerous sex crimes and to provide treatment for the dangerous sex offender." In sec. 975.11, Stats., the legislature stated that the department shall keep under its control sex offenders committed to it "so long as in its judgment such control is necessary for the protection of the public." Of course, a defendant may seek judicial review of the department's judgment, but the manifest intent of the Act remains the same: to avoid releasing into open society those who might commit additional sex crimes because of an uncured "mental or physical deficiency, disorder or abnormality." *See*, sec 975.14 (2), Stats.

For these reasons, it is our opinion that the standard for release which, as construed by *Torpy, supra*, includes the concept of psychological danger, is reasonably justified by the manifest concern for protecting the public, and that the defendant has not for this reason been denied equal protection.

As noted above, it is the defendant's position on this appeal that evidence relating to his criminal record was immaterial and thus irrelevant to the determination of extending the defendant's commitment because it did not conform to the evidentiary requirements specified in sec. 51.20(1)(a), Stats. Since we hold that this portion of the civil commitment statute is not applicable to a recommitment proceeding under sec. 975.14, the issue must be resolved on the basis of the rules governing evidence generally.

Relevancy is defined by sec. 904.01 as meaning "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In *State v. Becker*, 51 Wis.2d 659, 666–67, 188 N.W.2d 449 (1971), this court quoted the explanations of relevancy and materiality set out in McCormick, *Evidence*, sec. 152 at 315–16 (Hornbook Series) :

"In the courtroom the terms relevancy and materiality are often used interchangeably, but materiality in its more precise meaning looks to the relation between the propositions for which the evidence is offered and the issues in the case. If the evidence is offered to prove a proposition which is not a matter in issue nor probative of a matter in issue, the evidence is properly said to be immaterial. . . . Relevancy in logic is the tendency of evidence to establish a proposition which it is offered to prove. Relevancy, as employed by judges and lawyers, is the tendency of the evidence to establish a material proposition."

The Judicial Council Committee's Note to sec. 904.01 indicates that the rule was intended to broadly define relevancy. *Wisconsin Rules of Evidence*, 59 Wis.2d at R67.

There is no doubt that evidence relating to the defendant's criminal record is material and relevant to a Sex Crimes Act recommitment hearing. In such a hearing,

the fact-finder, in this case the jury, must resolve the question of whether the defendant's release from the structured hospital environment would pose a danger to the public because of his mental deficiency, disorder or abnormality. Sec. 975.14(2), Stats. Thus, insofar as it demonstrates the defendant's particular mental aberration (pedophilia) and his failure to control his sexual urges in open society, it tends "to make the existence of a fact that is of consequence to the determination of the action more probable . . . than it would be without it."

Nevertheless, such evidence, though relevant, is admissible only under certain circumstances. In Wisconsin the admission of evidence relating to other crimes or acts of the accused is governed by sec. 904.02(2), Stats:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

In several decisions, this court has held that evidence of a defendant's previous sex crime convictions was admissible in a trial on a similar charge. In *Hendrickson v. State*, 61 Wis.2d 275, 279, 212 N.W.2d 481 (1973), this court stated:

"A 'greater latitude of proof as to other like occurrences' is clearly evident in Wisconsin cases dealing with sex crimes, particularly those involving incest and indecent liberties with a minor child. This is not so much a matter of relaxing the general rule that it is not competent in a prosecution for one crime to introduce evidence of other offenses as it is a matter of placing testimony concerning other acts or incidents within one of the well established exceptions to such rule, as noted in *Whitty*, and codified in the new Wisconsin Rules of Evidence." (Footnotes omitted.)

In this case, we concluded that testimony of prior incestuous acts with the complaining witness and her sisters was admissible to prove the defendant's scheme or plan, as well as his motive or intent. *Hendrickson v. State, supra* at 282. In *State v. Tarrell,* 74 Wis.2d 647, 247 N.W.2d 696 (1976), this court held that evidence of separate acts, ranging from inappropriate remarks to a girl, to enticing a minor for immoral purposes, demonstrated a propensity to act out his sexual desires with young girls and thus had a logical connection with the charged offense of indecent behavior with a child.

"They intended to show a general scheme or motive. While the admission of this evidence was prejudicial, it was extremely relevant and was appropriately admitted. The probative value exceeded the prejudicial effect and as such was admissible." *State v. Tarrell, supra* at 658.

In McCormick, *Evidence,* sec. 190 at 449–50 (2d ed., Hornbook Series, 1972), it is stated that one of the exceptions to the general rule excluding proof of character by evidence of other crimes is when the evidence is offered to show "a passion or propensity for illicit sexual relations. . . ." Although McCormick continues by warning that generally "[o]ther like crimes with other persons do not qualify for this purpose . . . ," the above cited cases demonstrated that this is not the rule in Wisconsin.

We conclude, therefore, that the trial court did not err in permitting evidence concerning the defendant's past sexually motivated activity to be admitted in a Sex Crimes Act recommitment hearing. This is true even though the particular past convictions occurred several years before. The defendant has been under the control of the department continuously since his commitment following his most recent 1971 conviction.

It was also revealed during oral argument that he was confined for a substantial portion of the period between this conviction and the next previous conviction in 1963. In assessing the impact of the passage of time on the relevancy of evidence, periods of confinement will not be included in computing the time span between the prior incident and the present. *Sanford v. State*, 76 Wis.2d 72, 81–82, 250 N.W.2d 348 (1977).

Permitting the admission of such evidence during a Sex Crimes Act recommitment hearing does not amount to a presumption that the defendant's treatment was a failure. Rather, it is a recognition that this evidence may be, and in this case is, indicative of the defendant's pattern of behavior and is admissible in the discretion of the trial court. Indeed, because hearings are to be conducted by the committing court, sec. 975.13, Stats., the legislature itself has apparently recognized the relevancy of a defendant's past behavior.

*Jury Instructions*

The final issue raised by the defendant is whether the trial court erred in instructing the jury with respect to dangerousness. The defendant, in accordance with his position that the type of danger which must be demonstrated to extend a Sex Crimes Act commitment is set forth in the Mental Health Act, argues that the instruction was erroneous because it did not limit its definition of danger to the danger of physical harm required by sec. 51.20 (1) (a) 2, Stats.

As stated above, we conclude that the danger to the public required for a commitment extension under the Sex Crimes Act is not limited to physical danger. The defendant's argument must fail. The trial court's instruction on dangerousness was in conformity with the concept of danger as discussed by this court in *State v. Torpy, supra* at 116–17, and was therefore not error.

*By the Court.*—Order affirmed.