STATE, Plaintiff-Respondent, v. CRAMER,
Defendant-Appellant.†

Court of Appeals

*No. 78–766–CR. Submitted on briefs July 13, 1979.—
Decided August 24, 1979.*
(Also reported in 283 N.W.2d 625.)

† Petition to review pending. This petition was not decided at
the time the volume went to press. Its disposition will be reported
in a later volume.

554

For the defendant-appellant the cause was submitted on the briefs of *Richard L. Cates,* state public defender, and *Thomas K. Zander,* chief staff attorney, Legal Aid Society of Milwaukee, Mental Health Division.

For the plaintiff-respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Michael R. Klos,* assistant attorney general.

Before Decker, C.J., Cannon, P.J., and Moser, J.

DECKER, C.J.   On April 16, 1973, Ronald J. Cramer was convicted of indecent behavior with a child contrary to sec. 944.11(1), Stats. (1971), and subsequently was committed to the custody of the Department of Health and Social Services pursuant to sec. 975.06 by order of Judge O'Connell.   On June 6, 1978, pursuant to sec. 975.12(2), Stats., the Department ordered that its control over Cramer be extended beyond his mandatory release date[1] because release on parole would be dangerous to the public.[2]   The Department also applied to the circuit court for review of the order.[3]

At the hearing[4] the state moved *in limine* to prohibit evidence on behalf of the defendant with respect to his

[1] *See* secs. 53.11(7)(a) and 53.12.

[2] Secs. 975.12(2) and 975.13.

[3] Sec. 975.12(2).

[4] Conducted pursuant to secs. 975.06(1)(a) and (b) and 975.14 (1).

parole and parole plans. The motion was granted. During the presentation of the state's evidence, the defendant moved *in limine* to exclude testimony about Cramer from treating psychologists or psychiatrists, asserting a privilege pursuant to sec. 905.04, Stats. The motion was denied.

At the conclusion of the hearing the jury was instructed that the issue for resolution was whether "discharging the defendant at this time would be dangerous to the public," and the verdict was framed: "Do you find from the evidence presented that discharging the defendant from the control of the Department at this time would be dangerous to the public because of the defendant's mental or physical deficiency, disorder, or abnormality?" The jury answered affirmatively, and the circuit court confirmed the Department's order extending control over the defendant. In instructing the jury, the court defined the term "dangerous" as "not limited to physical harm [to others], but also includes the potential that the defendant would commit psychological harm [to others]."

Cramer appeals, contending that the jury instructions were erroneous, and that the trial court also committed error in its rulings on the motions *in limine*.

## THE JURY INSTRUCTIONS

Crame complains that a finding by the jury that he was not dangerous to the public would merely have made him eligible for mandatory release on parole on August 7, 1978, and that he would have been subject to the ultimate control of the Department until the expiration of the maximum term prescribed by law for the offense committed,[5] almost five years later. The thrust of his

---

[5] In this case that date was June 6, 1983. *See* sec. 944.11(1), Stats. (1971) and sec. 975.12(1), Stats. (1977).

argument is that while released on mandatory parole, he was subject to continued Department supervision and control, and that the instructions to the jury did not apprise the jury of that circumstance. Cramer argues that the jury instructions not only failed to acquaint the jury with the fact that he would be released on parole, but that in framing the jury instructions and the verdict in terms of discharge from control, the court also determined that evidence of parole plans and supervision was irrelevant. Thus, Cramer argues that the jury was not fully informed of the continued supervision and control of Cramer by the Department, and that the jury was effectively prevented from evaluating Cramer's release as a danger to the public in the context of the support that would be available to him when released on parole supervision.

The basis for Cramer's complaints is grounded upon a contradiction in terms between accepted department terminology and the express provisions of ch. 975, Stats. Possibly because the parole provisions of secs. 53.11 and 53.12 are applicable to persons committed pursuant to the Sex Crimes Laws (ch. 975), parole terminology such as "mandatory release date" and "maximum discharge date" have been utilized in connection with the commitments of persons convicted of sex crimes. Although those terms when applied to ordinary criminal convictions accurately described the certainty of dates that is inherent in *mandatory release* and *maximum discharge*, the terminology is not specifically accurate in connection with Sex Crimes Law commitments. Neither a mandatory release date nor a maximum discharge date is either "mandatory" or "maximum," because the dates can be extended by the Department (subject to committing-court review), pursuant to sec. 975.12(2).

Utilizing this semantically inappropriate terminology, Cramer construes the alternatives to extension of control (if recommended by the Department) as mandatory release on parole or maximum discharge from any control by the Department. The effect of that rationale in this case is to make the judicial proceeding pursuant to sec. 975.11 a forum for jury review of a denial of parole.

Cramer's rationale, although ingenious, is not persuasive. Parole is administered by the executive branch of the state government through the Department as one of its administrative agencies. Our supreme court has repeatedly extended judicial review to discretionary parole denials only upon considerations of due process reviewable by certiorari.[6]

This is not to say that Cramer has no right to due process in the present proceeding. Due process rights are implicated in review of a department order extending control to provide notice and fairness where a sex crimes offender has his liberty curtailed beyond otherwise applicable statutory limits.[7] The statutory demand, as well as the common-law judicial command for scrupulous adherence to principles of fundamental fairness, is directed in sec. 975.13, Stats., to the extension of departmental control of Cramer pursuant to an order of commitment, which is the legal consequence of a sex crime violation. That legal consequence is subject to statutory amelioration by mandatory parole under sec. 53.11(7)(a) or unqualified release after statutory limiting periods of time. Extension of control by the Department counter-

[6] State ex rel. Tyznik v. Dept. of Health & Social Services, 71 Wis.2d 169, 238 N.W.2d 66 (1976); State v. Goulette, 65 Wis.2d 207, 222 N.W.2d 622 (1974).

[7] State ex rel. Terry v. Schubert, 74 Wis.2d 487, 247 N.W.2d 109 (1976), vacated and remanded sub. nom. Percy v. Terry, 434 U.S. 808 (1977), reinstated 84 Wis.2d 693, 267 N.W.2d 380 (1978).

mands those statutory limits and extends a sex crimes offender's period of confinement. Chapter 975 provides a hearing and a review by the legal system of that modification of the legal consequences of a commitment order.

We view the provisions of secs. 975.13 and 975.14(2), Stats., prescribing the review of a departmental opinion that discharge of a committed sex crime offender from the control of the Department would be dangerous to the public, as presenting to the jury the question whether the Department should extend the institutionalization of the person committed. We reach that conclusion because the Department's opinion is triggered by sec. 975.12, Stats., when the offender approaches either his mandatory release or discharge date. Only those dates present points of time at which the statutory right to release clashes with a contrary departmental opinion to extend control. It is at the point of the clash between the right to release[8] and a contrary department opinion that the legislature has prescribed a legal system determination[9] whether the public's right to confinement of the offender transcends his right to release.

It is at the points of mandatory release or discharge that the offender's danger to the public is evaluated by the custodial Department, and if adverse to the offender, is reviewed by the legal system. Those points have in common the termination of institutionalization as the theme of review. That is the only common and single issue for determination in case of either mandatory release or discharge, and the statutes prescribed only a single issue of discharge from control.

Only at the conjunction of mandatory release or discharge and formation of the Department's opinion that

---

[8] We distinguish the right to release from permissive release.

[9] The determination is premised upon the rubric "danger to the public."

release from custody would be dangerous to the public is the Department without means to protect the public. The means for protecting the public that is about to terminate (if control is not extended) is the authority to keep the sex crimes offender in custody in an institution. The problem is identical whether prompted by mandatory release or discharge. The issue of whether control should be extended by further institutionalization is also identical.

"Discharge from control," as used in secs. 975.12(2), 975.13, and 975.14(2), Stats., means discharge or release from institutionalization. Cramer urges a strained and varying interpretation of that general phraseology. He contends that in the case of mandatory release on parole, the issue for the jury is whether the sex offender is too dangerous to be released on parole, while in the case of approaching discharge the issue is whether the sex offender is too dangerous to be released with "full liberty." Implicit in that argument is another contention that the issue for the jury may be whether the sex offender approaching discharge is too dangerous to be released upon "full liberty," but not too dangerous to be released upon parole. We do not find such a proliferation of issues apparent or inherent in the statutory terminology.

We believe that the preliminary[10] and final[11] jury

---

[10] In this case the defendant was convicted of the crime of indecent behavior with a child and committed to the Department of Health and Social Services for specialized treatment under the Wisconsin Sex Crimes Law. The defendant is to be discharged from that commitment upon the expiration of the term prescribed by law. The defendant has now reached that term. Wisconsin law, however, allows the Department to petition for continued control for a maximum additional period of five years. The Department has filed a petition in this case and claims that discharging the defendant at this time would be dangerous to the public because of the defendant's mental or physical deficiency, disorder or abnormality. Wisconsin law requires that a jury make

instructions, set forth in the margin, properly instruct the jury with respect to the question of continued institutionalization. Because the issue for resolution by the

the final decision on this continuance of control. That is the purpose of this hearing, to determine if the commitment of the defendant should continue because his discharge would be dangerous to the public due to his mental or physical deficiency, disorder or abnormality.

[11] The defendant was convicted of the crime of indecent behavior with a child and committed to the Department of Health and Social Services for specialized treatment under the Wisconsin Sex Crimes Law. The defendant is to be released upon the expiration of the maximum term prescribed by law for the offense less good time earned. However, the Department, that is, the Department of Health and Social Services, is of the opinion that discharging the defendant at this time would be dangerous to the public because of the defendant's mental or physical deficiency, disorder or abnormality and has ordered that the defendant remain subject to the Department's control for a maximum additional period of five years. Wisconsin law allows the Department to do this, but requires that the Department seek court and jury approval of this extension of control. This is the purpose of this hearing.

You, the jury, will now be asked to answer the following question:

Do you find from the evidence presented that discharging the defendant from the control of the Department at this time would be dangerous to the public because of the defendant's mental or physical deficiency, disorder or abnormality?

Before you answer this question "yes," the State must prove by evidence which satisfies you beyond a reasonable doubt that two elements are present:

First, that the defendant suffers from a mental or physical deficiency, disorder or abnormality;

Second, that the mental or physical deficiency, disorder or abnormality makes the defendant dangerous to the public.

The Department has recommended that control over the defendant be extended. You are not bound by the Department's recommendation. You should consider all the evidence in the case and you should consider the recommendation of the Department along with all of the other evidence giving to it just such weight as you deem it is entitled to receive.

jury is dangerousness to the public in the context of further institutionalization, we consider evidence of Cramer's parole plans irrelevant to the jury's determination of the fundamental issue. Exclusion of irrelevant evidence is not a denial of due process.[12]

Cramer further complains that the definition of "dangerousness" embraced in the jury instructions should include reference only to a substantial probability of physical harm and no reference to the potential to commit psychological harm on others. Cramer acknowledges that his argument was rejected by our supreme court in *State v. Hungerford*, 84 Wis.2d 236, 260, 267 N.W.2d 258, 263–67 (1978), but contends that enactment of ch. 428, 1977 Wis. Laws, modified sec. 51.20(1) and supplied a nexus to ch. 975 commitment extensions that *Hungerford* could not find. Specifically, sec. 51.20(1) (am) makes reference to ch. 975 only in the context of an involuntary commitment under ch. 51 that immediately follows a ch. 975 commitment. On its face, the statutory amendment

---

The term "dangerous" includes the defendant's potential for doing harm to others. The term "dangerous" includes the potential that the defendant would commit physical harm to others. However, the term "dangerous" as applicable here is not limited to physical harm, but also includes the potential that the defendant would commit psychological harm. An example of psychological harm would include the potential that if the defendant were discharged, he would seek out minors for sexual purposes and that such an encounter would have harmful effects on the normal sexual development of such minors. This means that if the defendant exhibits the potential to commit physical harm on others, he should be considered dangerous. It also means that if the defendant exhibits the potential to commit psychological harm on others, he should be considered dangerous. In making your determination, you may rely on a single definition of "dangerous" as given in these jury instructions or any combination of definitions of "dangerous" as given in these jury instructions.

[12] *Milenkovic v. State*, 86 Wis.2d 272, 286, 272 N.W.2d 320, 327 (Ct. App. 1978).

does not provide the nexus claimed for it.[13]  A minor modification of sec. 51.20(16)(g), combined with sec. 51.20(16)(j), does not make those sections discernibly different from the predecessor sections interpreted in *Hungerford,* where the issue was concluded adversely to Cramer's contention:

Thus, viewed strictly as a matter of statutory construction, it is clear that the legislature did not intend all of the provisions of the civil commitment statute relating to the reexamination of a civilly committed person to apply to hearings for the extension of control over a sexual deviate. Indeed, in sec. 51.20(17)(g), the legislature said as much: "Subsections (11) to (14) [which includes the reference to the statutory definition of danger] shall govern the procedure to be used in the conduct of . . . [a reexamination] hearing, *insofar as applicable.*" (Emphasis and insertions in original.)[14]

Moreover, with respect to the question of what standard must be met to extend control over one committed under the Sex Crimes Act, it is instructive that the legislature did not modify that language which, in *State v. Torpy,* [52 Wis.2d 101, 187 N.W.2d 858 (1971)], this court found to include the danger of psychological harm to the public. The legislature's failure to do so is particularly telling inasmuch as ch. 975 was also the subject of legislative amendment in 1975.

This court has consistently followed the rule that "[t]he legislature is presumed to know that in the absence of its changing the law, the construction put upon it by the court will remain unchanged. . . ." *Zimmerman v. Wisconsin Electric Power Co.,* 38 Wis.2d 626, 634, 157 N.W.2d 648, 651 (1968). *See also, Milwaukee Federation of Teachers, Local No. 252 v. WERC, Wis.,* 266 N.W.2d 314 (1978); *In re Estate of Haese,* 80 Wis.2d 285, 294, 259 N.W.2d 54 (1977); 2A Sutherland, *Statutory Construction,* §45.12 at 37 (4th ed., Sands, 1973).

[13] A similar argument was made and rejected in *State v. Gebarski,* 90 Wis.2d 754, 280 N.W.2d 672 (1979).

[14] The references to the current 1977 Statutes are sec. 51.20 (16)(g) and subsections (10) to (13).

This is especially true in those situations where the legislature has enacted legislation in an area covered in part by other, previously enacted statutes: "[I]t is assumed that whenever the legislature enacts a provision it had in mind previous statutes relating to the same subject matter, wherefore it is held that in the absence of any express repeal or amendment therein, the new provision was enacted in accord with the legislative policy embodied in those prior statutes, and they should all be construed together." 2A Sutherland, *Statutory Construction,* §51.02 at 290 (4th ed., Sands, 1973). (*Supra,* at 250–52, 267 N.W.2d at 266–67.) (Footnotes omitted.)

The trial court properly included the potential for psychological harm in the definition of dangerousness.

## THE PSYCHIATRIST-PSYCHOLOGIST PRIVILEGE

Cramer objected at trial to the evidence introduced by the state from a psychologist who had administered psychotherapy to Cramer at either Central State Hospital or Winnebago Mental Health Institute, and two physicians. Cramer claims that the testimony from those witnesses is privileged and should have been excluded. At the outset we note that Cramer's objection sweeps too broadly because the privilege provided by sec. 905.04, Stats., is limited to confidential comunications.[15] In spite of that fatal deficiency, Cramer reiterates the argument made above in connection with the definition of dangerousness and asserts that the amendment by ch. 428, 1977 Wis. Laws, to sec. 51.20(16)(g) modified the rule of *Hungerford* that the exception to the privilege entitled "Proceedings for hospitalization," prescribed by sec. 905.04(4)(a), made the privilege inapplicable to a commitment extension hearing pursuant to ch. 975.

Since the decision in *Hungerford,* sec. 51.20(16)(g) [formerly 51.20(17)(g)], Stats., was amended to speci-

---

[15] Secs. 905.04(1)(c) and (2), Stats.

fy: "The privileges provided in ss. 905.03 and 905.04 shall apply to reexamination hearings." For the reasons stated in *Hungerford* and quoted above, the provision does not refer to a ch. 975 commitment-extension hearing. Nothing in the quoted provisions of sec. 51.20(16) (g), if it were applicable here, modifies the rule of *Hungerford* excluding application of the privilege provided by sec. 905.04(2) from proceedings of the kind here involved by virtue of sec. 905.04(4)(a).

*By the Court.*—Order affirmed.