STATE EX REL. GEBARSKI, Petitioner, v. CIRCUIT COURT
FOR MILWAUKEE COUNTY, Respondent.
STATE EX REL. SCHWULST, Petitioner, v. CIRCUIT COURT
FOR MILWAUKEE COUNTY, Respondent.

*No. 76–634–OA. Argued October 4, 1977.—
Decided November 14, 1977.*
(Also reported in 259 N. W. 2d 531.)

For the petitioners there were briefs by *Carol W. Medaris,* Corrections Legal Services Program, and *Peter E. McKeever* and *William J. Lundstrom* of Legal Assistance to Inmates Program, with oral argument by *Carol W. Medaris* and *William J. Lundstrom* all of Madison.

For the respondent the cause was argued by *Pamela Magee-Heilprin* and *Edward S. Marion,* assistant attorneys general, with whom on the brief were *Bronson C. La Follette,* attorney general, and *Marguerite M. Moeller,* assistant attorney general.

Amicus curiae brief was filed by *Howard B. Eisenberg,* state public defender.

CONNOR T. HANSEN, J. The question presented is whether the petitioners are entitled to a jury determination of their present mental condition. We are of the opinion they are entitled to such a determination under the provisions of sec. 971.17 (2), Stats.

The facts are not in dispute in either case. On December 7, 1973, a jury found petitioner, Brian A. Gebarski, not guilty by reason of mental disease or defect of two counts of first-degree murder, one count of second-degree murder, and one count of endangering safety by conduct regardless of life. Immediately thereafter he was committed to the custody of the Department of

Health & Social Services. There has been no subsequent re-examination of his mental condition and he is now confined at the Winnebago Mental Health Institute.

On January 27, 1977, Gebarski petitioned the trial court for re-examination pursuant to sec. 971.17(2), Stats., and requested a jury trial. An order was entered denying a jury trial and the instant proceedings followed.

On June 27, 1975, petitioner, Allen Lee Schwulst, was committed to Central State Hospital following his acquittal of a charge of arson by reason of mental disease or defect. Schwulst has since filed three petitions with the trial court for re-examination. Each has been denied. The third petition, dated January 13, 1977, requested a jury trial pursuant to sec. 971.17(2), Stats., and is the subject of this proceeding.

Proceedings on both the Gebarski and Schwulst petitions for re-examination have been continued pending disposition of this action.

Sec. 971.17(2), Stats.[1] provides that a person committed following acquittal of a crime by reason of mental defect or disease may be periodically re-examined "as provided in s. 51.20(17), except that the reexamination shall be before the committing court. . . ." We arrive at the conclusion there is a right to a jury determination because a sec. 971.17(2) re-examination is to be conducted ". . . as provided in s. 51.20(17) . . . ." Sec.

[1] "(2) A reexamination of a defendant's mental condition may be had as provided in s. 51.20(17), except that the reexamination shall be before the committing court and notice shall be given to the district attorney. The application may be made by the defendant or the department. If the court is satisfied that the defendant may be safely discharged or released without danger to himself or herself or to others, it shall order the discharge of the defendant or order his or her release on such conditions as the court determines to be necessary. If it is not so satisfied, it shall recommit him or her to the custody of the department."

51.20 (17) (g) [2] provides that "[s]ubsections (11) to (14) [of sec. 51.20] shall govern the procedure to be used in the conduct of such hearing, insofar as applicable." One of the included subsections is sec. 51.20 (12), which provides for a jury determination. [3]

Sec. 917.17 (2), Stats., provides ". . . that the reexamination shall be before the committing court . . ." and further provides:

". . . If the court is satisfied that the defendant may be safely discharged or released without danger to himself or herself or to others, it shall order the discharge of the defendant or order his or her release on such conditions as the court determines to be necessary. If it is not so satisfied, it shall recommit him or her to the custody of the department."

The use of the term "court" throughout this subsection gives rise to the present proceedings. The resolution of the issue presented is therefore dependent upon the interpretation of the statutory language. The respondent contends that by providing for examination before

[2] "(g) Upon the filing of a report the court shall fix a time and place of hearing and cause reasonable notice to be given to the petitioner, the treatment facility, the patient's legal counsel and the guardian of the patient, if any, and may notify any known relative of the patient. Subsections (11) to (14) shall govern the procedure to be used in the conduct of such hearing, insofar as applicable."

[3] *(12)* JURY TRIAL. (a) If before involuntary commitment a jury is demanded by the individual against whom a petition has been filed under sub. (1) or by the individual's counsel, the court shall direct that a jury of 6 people be drawn to determine if beyond a reasonable doubt the allegations specified is sub. (1) (a) are true. If a jury trial demand is filed within 5 days of detention, the final hearing shall be held within 14 days of detention. If a jury trial demand is filed later than 5 days after detention, the final hearing shall be held within 14 days of the date of demand.

"(b) No verdict shall be valid or received unless agreed to by at least 5 of the jurors."

"the committing court," the statute precludes a jury trial. Petitioners maintain that this language merely places exclusive venue in the committing court,[4] and that the term "court" should be understood to embrace the tribunal itself, including its constituent parts of judge and jury.

The respective parties direct our attention to *State ex rel. Terry v. Schubert*, 74 Wis.2d 487, 247 N.W.2d 109 (1976); *State ex rel. Kovach v. Schubert*, 64 Wis.2d 612, 219 N.W.2d 341 (1974); and *State v. Cook*, 66 Wis.2d 25, 224 N.W.2d 194 (1974), to sustain their respective positions. From our examination of these cases they cannot be considered dispositive of the present issue. In none of these cases was this court directly confronted with the question of jury availability under sec. 971.17 (2), Stats., nor is there any indication that the statutory language was brought under close scrutiny. The briefs in the three cases did not raise the issue. The respondent considers *State v. Cook, supra,* to hold that the determination of dangerousness is an exclusively judicial function. If we were to accept this interpretation, difficulties would be encountered in view of the subsequent revision of the statutes to provide for a jury determination of dangerousness in proceedings for civil commitment under ch. 51. Secs. 51.20 (1) (a) 2 and 51.20 (12). *(See also: Humphrey v. Cady*, 405 U.S. 504, 509, 92 Sup. Ct. 1048, 31 L. Ed.2d 394 (1972), describing jury determination of dangerousness in initial commitment proceedings in Wisconsin as a "critical function.") For these reasons, the decisions cited do not control this case. They serve only to demonstrate that the statutory language will bear either of the constructions urged here.

---

[4] Persons committed under ch. 51, Stats., may be re-examined in either the county from which they were committed or the county where they are detained. Sec. 51.20 (17) (b), Stats.

The issue, then, is whether the word "court" shall be construed as having precisely the same meaning each time it is used in sec. 971.17 (2), Stats.

In *Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 52 Sup. Ct. 607, 76 L. Ed. 1204 (1932), the United States Supreme Court was considering the Sherman Act as it related to acts "in restraint of trade or commerce" as the phrase was used at various places in the Act, and at page 433 stated:

". . . Most words have different shades of meaning and consequently may be variously construed, not only when they occur in different statutes, but when used more than once in the same statute or even in the same section. Undoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning . . . But the presumption is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent. Where the subject matter to which the words refer is not the same in the several places where they are used, or the conditions are different, or the scope of the legislative power exercised in one case is broader than that exercised in another, the meaning well may vary to meet the purposes of the law, to be arrived at by a consideration of the language in which those purposes are expressed, and of the circumstances under which the language was employed . . . [Citations omitted]

"It is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the legislature intended it should have in each instance. *Louisville & N. R. Co. v. Gaines,* 3 Fed. 266, 277, 278."

In *Milwaukee County v. State Dept. of ILHR, et al.,* 80 Wis.2d 445, 259 N.W.2d 118 (1977), we stated that:

"A fundamental rule of statutory interpretation is that the 'intent of the legislature is a controlling factor.' *Safe Way Motor Coach Co. v. Two Rivers,* 256 Wis. 35, 40, 39 N.W.2d 847 (1949). This court has said that 'the aim of all statutory construction is to discern the intent of the legislature. . . .' *Green Bay Packaging, Inc. v. ILHR Dept.,* 72 Wis.2d 26, 35, 240 N.W.2d 422 (1976)."

and that:

". . . 'the purpose of the whole act is to be sought and is favored over a construction which will defeat the manifest object of the act.' *Student Assn. of UW-M v. Baum,* 74 Wis.2d 283, 294–5, 246 N.W.2d 622 (1976) . . ."

and that:

"[fn. 14] A general rule of statutory construction is that each part of a statute should be construed in connection with every other part so as to produce a harmonious whole. *Pelican Amusement Co. v. Town of Pelican,* 13 Wis.2d 585, 593, 109 N.W.2d 82 (1961) . . . ."

We believe the disputed provisions of the statute are subject to a reasonable interpretation so that it will be functional in its entirety and the legislative intent thus attained. It has been said that ". . . where a statute uses the word 'court,' it is a matter of construction of the legislative intent whether that term refers to the judge alone or to both judge and jury." 20 Am. Jur.2d, *Courts,* sec. 5, at 391. To determine the legislative intent, it is necessary to examine the origins and history of the statute.

The right to jury trial on re-examination first appeared in Wisconsin in 1881.[5] There is no question that

---

[5] Section 4698, Rev. Stats. 1878, provided for the confinement and discharge of persons acquitted on the basis of mental illness in the same manner ". . . as other insane persons . . ." Ch. 266,

that right survived undiminished until 1949.[6] The crux of the statutory issue is whether a 1949 amendment abolished that right.

Section 357.11(4), Stats. 1947,[7] provided:

"(4) A re-examination of his sanity or mental condition may be had as provided in section 51.11, except such person shall make his application for rehearing to *the court* from which he was committed. If upon such rehearing *a jury* shall determine he is insane or feeble-minded, then another hearing shall not be had thereafter unless the court which had jurisdiction in the first case shall be satisfied there is reasonable cause to believe that there is an improvement in the person's mental condition, in which case such court may order *another jury trial.* No such person so committed shall be discharged from detention unless the *magistrate or the jury* upon whom devolves the duty to pass upon his sanity and mental condition shall, in addition to finding him sane and mentally responsible, also find that he is not likely to have such a recurrence of insanity or mental irresponsibility as would result in acts, which, but for insanity or mental irresponsibility, would constitute crimes. . . ." (Emphasis added.)

By Laws of 1949, ch. 631, sec. 129, this section was amended to read:

"(4) A reexamination of his mental condition may be had as provided in section 51.11, except that his application for rehearing shall be *to the committing court.* If upon such reexamination *the court* finds he is insane or feeble-minded, another reexamination shall not be

---

Laws of 1880, *codified* as sec. 593, Rev. Stats. 1889, provided for a jury trial of initial civil commitments, and ch. 202, Laws of 1881, sec. 4, *codified* as sec. 593a(4), Rev. Stats. 1889, made the provisions of sec. 593 applicable to proceedings for the discharge of committed persons. The jury trial right of sec. 593 thus ran, through sec. 593a and sec. 4698, to persons committed on acquittal.

[6] By ch. 221, Laws of 1911, *amending* sec. 4697, Rev. Stats. 1898, the legislature expressly provided for re-examination by a magistrate or jury.

[7] Sec. 4697 had been renumbered by ch. 4, Laws of 1925.

had unless the court is satisfied there is reasonable cause to believe that his mental condition is improved, in which case the court may order *another examination.* No person so committed shall be discharged unless *the court*, in addition to finding him sane and mentally responsible, also finds that he is not likely to have a recurrence of insanity or mental irresponsibility as will result in acts which but for insanity or mental irresponsibility would be crimes." (Emphasis added.)

Respondent maintains that the change in terminology from "jury" to "court" is substantive and deliberate and precludes trial by jury.

Respondent cannot and does not rely solely upon the fact that the application for the re-examination was to be "to the committing court." Language to the same effect appears in the earlier statute expressly providing for jury trial, and, therefore, cannot be considered incompatible with jury trial.[8] Rather, respondent argues that the change from "[i]f . . . a jury shall determine he is insane . . ." to "[i]f . . . the court finds he is insane. . . ," and the change from ". . . such court may order another jury trial . . ." to ". . . the court may order another examination. . . ," evince an intent to remove the jury from re-examination proceedings.

The 1949 bill made nearly identical changes to sec. 357.13(4), Stats. 1947, which concerned competency to stand trial.[9] The drafting committee's explanatory note

---

[8] This language was added by Laws of 1933, ch. 262.

[9] Sec. 357.13(4), Stats. 1947, provided in pertinent part:

"(4) Any person committed under the provisions of this section shall at any time after said commitment be entitled to a rehearing as to such sanity as provided by, and according to procedure outlined in, section 51.11, except such person *shall make his application for rehearing to the court from which he was committed.* If upon such rehearing *a jury shall determine* he is insane or feeble-minded, then another hearing shall not be had thereafter unless the court which had jurisdiction in the first case shall be satisfied there is reasonable cause to believe that there is an im-

to these changes says that the section "is amended to conform the procedure on rehearing to that in cases arising under ch. 51." *Comment of Advisory Committee,* 1949, 1950 Wisconsin Annotations, p. 1562. Chapter 51 provided for trial by jury. Sec. 51.03, Stats. 1949. This explanation seriously undercuts respondent's theory that virtually identical changes, made by the same bill, removed the jury from sec. 357.11(4), Stats. 1947.

Respondent suggests no reason why jury trials would have been eliminated. Several years earlier, however, the Joint Interim Committee on Revision of Public Welfare Laws had urged the abolition of jury trials in sanity hearings. *See: GENERAL COMMENT OF INTERIM COMMITTEE,* 1947, preceding ch. 51, Stats., 1947. Although the proposal was rejected by the legislature, the committee suggested several reasons for such a change.

Among these reasons were a desire to make the proceedings as informal as possible to avoid any resemblance to criminal prosecutions; the feeling that jurors were frequently selected "from among the town idlers" and were inclined to release a dangerous person "unless he is a raving maniac;" and the belief that the judge had no discretion to disregard the verdict and could not even instruct the jury on the legal nature of insanity.

---

provement in the person's mental condition, in which case such court may order *another jury trial. . . ."* (Emphasis added.)

Sec. 357.13(4), Stats. 1949, provided in pertinent part:

"(4) A person committed under this section shall be entitled to a rehearing as to his sanity, as provided by section 51.11, except that his *application for rehearing shall be to the court which committed him. If he is found* insane or feeble-minded, another rehearing shall not be had unless the court is satisfied there is reasonable cause to believe that there is improvement in his mental condition, in which case the court may order *another rehearing. . . ."* (Emphasis added.)

The 1949 amendments were part of a comprehensive revision of the code of criminal procedure prepared by the Legislative Advisory Committee on Rules of Pleading, Practice and Procedure. There is nothing to indicate that this committee shared the concerns which motivated the Joint Interim Committee in 1947. There is nothing to indicate an intent to eliminate jury trials. In fact, there is nothing to indicate an intent to make any substantive change in sec. 357.11, Stats. 1947.

The earlier committee had considered the abolition of jury trials in sanity hearings to be "[p]robably the foremost recommendation" in its comprehensive revision of the mental health laws, and had devoted eleven paragraphs to its defense. GENERAL COMMENT OF INTERIM COMMITTEE, 1947, preceding ch. 51, Stats. 1947. Nevertheless, the legislature had rejected the proposal. If the 1949 bill had been intended to readvance so important a proposal, some comment could be expected, but none appears.

This absence is particularly telling in light of an explanatory law review article written by Assistant Attorney General William Platz, principal draftsman of the bill.[10] This article is properly subject to judicial notice. *Wisconsin Valley Imp. Co. v. Public Serv. Comm.,* 7 Wis.2d 120, 95 N.W.2d 767 (1959).

In his article, Mr. Platz explains the significance of the committee's explanatory notes, published in the 1950 Wisconsin Annotations:

". . . They will provide a guide to the construction of the statutes similar to the revisor's notes attached to revision bills. In general, it can be said that *where there is no such note to any particular section of the bill, any change in language is not intended to change the mean-*

---

[10] On Mr. Platz's role, see: Bill file for ch. 631, Laws of 1949, in Wisconsin Legislative Reference Bureau, and 1949 Wis. Law. Rev. 7.

*ing of the statute revised.* A great many sections will be found to have been rewritten in this manner without change in meaning." (Emphasis added.) Platz, *The 1949 Revision of the Wisconsin Code of Criminal Procedure,* 1950 Wis. L. Rev. (pt. 1) at 28, 29.

No note accompanies the amendments to sec. 357.11, Stats. 1947. This strongly suggests that no change in meaning was intended.

This conclusion is buttressed by the fact that Mr. Platz's three-part article, which painstakingly catalogues and explains "[e]ach change" made by revision of the former law, *Platz, supra,* (pt. 2) at 508, contains not a word about the amendments to sec. 357.11, Stats.

The article does suggest a possible reason for the amendments. Mr. Platz explains that one purpose of the revision was the "[e]limination of verbose language and simplification of terminology." *Platz, supra,* (pt. 1) at 29. Throughout the code, for example, the word "offense" was eliminated and the word "crime" substituted. Similarly, the word "recognizance" was replaced with the term "bail bond." *Platz, supra,* (pt. 1) at 29.

The term "court" may similarly have been introduced as synonymous with "judge or jury." A term which embraced both fact finders would have been technically more accurate, since trial would be to the judge whenever jury trial was waived, and would have been preferable as a matter of grammatical style because it would have been succinct. In view of the explanatory materials, we are not persuaded by the suggestion that the revision abolished the right to a jury trial.

While the statute has since been twice renumbered and has undergone modifications, the post-1949 changes are unrelated to the right to jury trial. The most recent of these changes were enacted by ch. 430, Laws of 1975, the Mental Health Act of 1975. Both parties devote themselves to arguing that these 1975 modifications did

not affect the right to jury trial, a fact which neither of them seems to dispute. Petitioners insist that the Mental Health Act did not remove the right; respondent insists that it did not confer it. The real controversy is whether it existed previously, and more specifically, whether it survived the 1949 amendments. We conclude the legislative history dictates that a right to a jury trial existed both prior to and after the 1949 amendments. Sec. 971.17(2), Stats., by incorporating by reference sec. 51.20(17)(g) and sec. 51.20(12), provides for a right to a trial by jury.

Inasmuch as we have determined that a defendant may have a jury trial pursuant to sec. 917.17(2), Stats., for re-examination of his mental condition, we deem it appropriate to make some observations in regard to the form of the verdict. The verdict should contain three questions: (1) Whether the defendant should be recommitted to the custody of the department; (2) whether the defendant may be safely discharged; and (3) whether the defendant may be safely released upon such conditions as the court [trial judge] deems necessary. In the event the jury determined the defendant could be safely released upon conditions, it would then be incumbent upon the trial judge to establish the proper conditions of release after giving due consideration to the nature of the evidence presented and the full panoply of options available for release on conditions, and the jury should be so instructed.

Since we have determined that petitioners may have a jury trial pursuant to sec. 917.17(2), Stats., it is not necessary that we consider the issues of equal protection and due process.

We therefore determine that writs of mandamus should issue directing the respondent to grant the petitions for a jury trial for re-examination of each peti-

tioner's mental condition pursuant to sec. 917.17(2), Stats.

*By the Court.*—The writs of mandamus shall issue consistent with this opinion.