STATE, Plaintiff-Respondent, v. GEBARSKI, Defendant-Appellant.

Supreme Court

*No. 77–692–CR. Argued January 9, 1979.—*
*Decided June 29, 1979.*
(Also reported in 280 N.W.2d 672.)

For the appellant there were briefs and oral argument by *William J. Lundstrom,* staff attorney, Legal Assistance to Inmates Project, of Madison.

For the respondent the cause was argued by *Pamela Magee-Heilprin* and *Edward S. Marion,* assistant attorneys general, with whom on the brief was *Bronson C. La Follette,* attorney general.

DAY, J.  This is an appeal from a judgment and order of recommitment entered by the circuit court for Milwaukee county, the Honorable Christ T. Seraphim, presiding, on February 16, 1978, and an order denying the defendant-appellant's post-trial motions rendered on March 10, 1978, all of which resulted in the defendant's recommitment under sec. 971.17(2), Stats. (1975) to the custody of the Department of Health and Social Services.

The questions raised on this appeal are the following:

The principle question is: Is the state required to prove in a recommitment hearing under 971.17(2) that a defendant is presently mentally ill and a proper subject for treatment as well as proving that he is dangerous to himself or others?

We conclude that the answer is no and that the state is required to prove only that the defendant is presently of danger to himself or others.

The second question raised by the defendant is: Did the trial court err in not discharging the defendant at the close of the state's case on the theory that the state's case lacked sufficient probative value to justify recommitment?

We conclude that the question is moot because the defendant chose to put in his case after the state rested so that it is the state of the record at the completion of the entire trial that must be looked at to determine sufficiency of the evidence.

The third question is: Was there sufficient evidence for the jury to find at the conclusion of the trial that the defendant was of danger to himself or others?

We conclude that the evidence was sufficient to support the jury's verdict.

Brian Anthony Gebarski (hereinafter defendant) was found not guilty by reason of mental disease or defect of two counts of first degree murder, one count of second degree murder, one count of attempted murder, and one count of endangering safety by conduct regardless of life following a jury trial on December 6, 1973. At that time he was committed to the custody of the Department of Health and Social Services without further hearing under sec. 971.17(1), Stats., which provided:

"971.17. **Legal effect of finding of not guilty because of mental disease or defect.** (1) When a defendant is found not guilty by reason of mental disease or defect, the court shall order him to be committed to the

department to be placed in an appropriate institution for custody, care and treatment until discharged as provided in this section."[1]

On January 27, 1977, the defendant filed a petition for re-examination under secs. 971.17(2)[2] and 51.20(17),[3] Stats. (1975) and demanded a jury trial. The jury trial

[1] Since the defendant's original commitment, this court decided in *State ex rel. Kovach v. Schubert*, 64 Wis.2d 612, 622, 219 N.W. 2d 341 (1974) that following a finding of not guilty by reason of mental disease or defect, the jury must also decide whether the defendant is presently suffering from a mental illness and is in need of institutionalized treatment.

[2] "971.17. **Legal effect of finding of not guilty because of mental disease or defect.** . . . (2) A reexamination of a defendant's mental condition may be had as provided in s. 51.20(17), except that the reexamination shall be before the committing court and notice shall be given to the district attorney. The application may be made by the defendant or the department. If the court is satisfied that the defendant may be safely discharged or released without danger to himself or herself or to others, it shall order the discharge of the defendant or order his or her release on such conditions as the court determines to be necessary. If it is not so satisfied, it shall recommit him or her to the custody of the department."

[3] "51.20. **Involuntary commitment for treatment.** . . . (17) RE-EXAMINATION OF PATIENTS. . . . (4) Reexaminations under this subsection are subject to the standards prescribed in sub. (14) (g)."

"(17) REEXAMINATION OF PATIENTS. . . . (g) Upon the filing of a report the court shall fix a time and place of hearing and cause reasonable notice to be given to the petitioner, the treatment facility, the patient's legal counsel and the guardian of the patient, if any, and may notify any known relative of the patient. Subsections (11) to (14) shall govern the procedure to be used in the conduct of such hearing, insofar as applicable. . . .

"(j) This subsection applies to petitions for reexamination which are filed pursuant to chs. 971 and 975."

"51.20. . . . (14) DISPOSITION. . . . (g) . . . Upon application for extension of a commitment by the department or the board having custody of the subject, the court shall proceed under subs. (11) to (14). If the court determines that the individual is a proper subject for commitment as prescribed in sub. (1)(a), or

began on February 14, 1978. Before the start of the trial, the defendant submitted proposed jury instructions which would have required a jury determination that he was presently mentally ill and a proper subject for treatment as well as dangerous to himself or others prior to recommitment under sec. 971.17(2), Stats. (1975).

there is a substantial likelihood, based on the individual's treatment record, that the individual would be a proper subject for commitment under sub. (1)(a) if treatment were withdrawn, it shall order judgment to the effect and continue the commitment. The burden of proof is upon the board or other person seeking commitment to establish evidence that the subject individual is in need of continued commitment."

"51.20. . . . (14) DISPOSITION. . . . (e) All findings of mental illness, need for treatment and dangerousness under this subsection shall be made based on evidence proven beyond a reasonable doubt."

"51.20. **Involuntary commitment for treatment.** (1) PETITION FOR EXAMINATION. (a) Every written petition for examination shall allege that the subject individual to be examined:

"1. Is mentally ill, drug dependent, or developmentally disabled and is a proper subject for treatment; and either

"2. Is dangerous because of:

"a. A substantial risk of physical harm to the subject individual as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm; or

"b. A substantial risk of physical harm to other persons as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do such physical harm; or

"3. Evidences a very substantial risk of physical impairment or injury to the subject individual, as manifested by evidence that his or her judgment is so affected that he or she is unable to protect himself or herself in the community and that reasonable provision for his or her protection is not available in the community and the individual is not appropriate for placement under s. 55.06. The subject individual's status as a minor does not automatically establish dangerousness under this subparagraph."

The trial court rejected the defendant's proposed instructions and instead instructed the jury that the question raised by the defendant's petition was "whether he may be safely discharged or released without danger to himself or others."

During the trial, the state called Stanley and Lillian Kurz who testified to the events which led to the defendant's underlying conviction for first and second degree murder, attempted murder, and endangering safety by conduct regardless of life in 1973. The state also called Dr. Kevin Kennedy who testified that at the time the defendant committed the offenses in 1973 he was suffering from a mental illness which "rendered him unable to rationally judge his action and to understand the right or wrongfulness of his acts and to conform his conduct within the requirements of the law." The state then rested its case. At the close of the state's case, the defense moved for a directed order of discharge or directed verdict. The motion was denied.

The defendant then proceeded to put in his case and called several witnesses in his behalf.

At the end of the testimony, three forms of verdict were submitted to the jury. One read: "We, the Jury find Brian Gebarski should be recommitted to the custody of the department," Yes —, No —. The second read: "We, the Jury find Brian Gebarski may be safely released upon such conditions as the court deems necessary." Yes —, No —. The third read: "We, the Jury find Brian Gebarski may be safely discharged. Yes —, No —."

The jury returned the first verdict, answering "yes," and the court entered a judgment and order recommitting the defendant to the custody of the Department of Health and Social Services for institutionalized treatment. On March 10, 1978, the trial court denied the defendant's post-trial motions for discharge, reversal or a new hearing.

QUESTION #1: IS THE STATE REQUIRED TO PROVE IN A RECOMMITMENT HEARING UNDER 971.17(2) THAT A DEFENDANT IS PRESENTLY MENTALLY ILL AND A PROPER SUBJECT FOR TREATMENT AS WELL AS PROVING THAT HE IS DANGEROUS TO HIMSELF OR OTHERS?

The defendant argues that the legislature by the enactment of ch. 430, Laws of 1975 amended the reexamination provisions of 971.17(2) to conform with the standards for initial civil involuntary commitment.

Sec. 971.17(2), Stats. (1975)[4] affords a defendant committed to a mental institution following an acquittal by reason of insanity the right to petition for a reexamination.

The change in 1975 in the section was a product of a major recodification of ch. 51 which embodies Wisconsin's mental health laws. The revisions were accomplished by the passage of ch. 430, Laws of 1975 which took effect on December 5, 1976. The revisions came following *Lessard v. Schmidt,* 349 F. Supp. 1078 (E.D. Wis. 1972); vacated and remanded on procedural grounds, 414 U.S. 473 (1974); judgment reentered 379 F. Supp. 1376 (1974); vacated and remanded on procedural grounds, 421 U.S. 957 (1975); judgment reentered, 413 F. Supp. 1318 (1976). *Lessard* found Wisconsin's laws providing for civil commitment of those alleged to be mentally ill to be constitutionally defective because among other things it failed to require proof of both mental illness and dangerousness beyond a reasonable doubt. [Contra, *Addington v. Texas,* — U.S. —, 99 S. Ct. 1804, 60 L. Ed.2d 323 (1979).]

The court in the case at bar instructed the jury:

"The state must prove to your satisfaction, beyond a reasonable doubt, that Brian Gebarski cannot be safely

---

[4] See fn. 2.

discharged or released without danger to himself or others. . . ."

Prior to the 1975 revisions, sec. 971.17(2), Stats. (1973) assigned to the defendant the burden of proving that he could be safely discharged or released without danger to himself or others. However, ch. 430, Laws of 1975, deleted that provision but then provided:

"If the court is satisfied that the defendant may be safely discharged or released without danger to himself or herself or to others. . ."[5]

This revision made it clear that the standard to be applied in a re-examination under 971.17(2) was to be the standard of dangerousness to self or others. It is significant that with the comprehensive revision of the mental health laws by ch. 430, that the legislature did not merely delete the section that the defendant had the burden of proving that he could be safely discharged or released without danger to himself or others, but re-emphasized the standard by specificially making it the duty of the court to be so satisfied.

In so doing it was following the interpretation that this court had given to the 1973 version of the statute set forth in *State v. Cook*, 66 Wis.2d 25, 224 N.W.2d 194 (1974). In interpreting the statute, the court said:

---

[5] Sec. 77 of ch. 430, Laws of 1975, amended 971.17(2) as follows:
"971.17(2) A reexamination of a defendant's mental condition may be had as provided in s. 51.11 *51.20(17)*, except that the reexamination shall be before the committing court and notice shall be given to the district attorney. The application may be made by the defendant or the department. The burden shall be on the defendant to prove that he may safely be discharged or released without danger to himself or others. If the court is so satisfied *that the defendant may be safely discharged or released without danger to himself or herself or to others*, it shall order the discharge of the defendant or *order* his *or her* release on such conditions as the court determines to be necessary. If it is not so satisfied, it shall recommit him *or her* to the custody of the department."

"It should be noted that the statute does not ask the trial judge to hinge his decision on the question of whether the defendant remains mentally ill. Rather, the judge must consider whether the defendant will be a danger to himself or to others. This essentially is the standard which a trial judge uses when he sentences a defendant in an ordinary criminal proceeding." *Cook, supra,* 66 Wis.2d at 29.

The statute providing for re-examination at the time read as follows:

"971.17. . . . **Legal effect of finding of not guilty because of mental disease or defect.** . . . (2) A reexamination of a defendant's mental condition may be had as provided in s. 51.11, except that the reexamination shall be before the committing court . . ."

An examination of 51.11(4) provided in part:

"51.11. **Reexamination of patients.** . . (4) The provisions of s. *51.02, so far as applicable,* shall govern the the procedure." (Emphasis supplied.)

Sec. 51.02(5) provided:

"51.02. **Procedure to determine mental condition.** . . (5) COURT'S DECISION. At the conclusion of the hearing the court may:
"(a) Discharge the patient if satisfied that he is not mentally ill or infirm or deficient, so as to require care and treatment, or
"(b) Order him detained for observation if in doubt as to his mental condition, or
"(c) Order him committed if satisfied that he is mentally ill or infirm or deficient and that he is a proper subject for custody and treatment, or
"(d) In case of trial by jury, order him discharged or committed in accordance with the jury verdict."

■

It is clear from the *Cook* case that in spite of the cross-referencing in 971.17(2), Stats. (1973) to 51.11 and 51.02, the provisions in 51.02 for a finding by the court

as to mental illness, infirmity or deficiency did not apply and that the only standard was dangerousness.

The 1975 revisions of the statute as contained in ch. 430, *supra,* are to the same effect. The new statute provided that re-examination under 971.17 (2) "may be had as provided in section 51.20 (17). . ."

Sec. 51.20 (17) (j), Stats. (1975) provides: "This subsection applies to petitions for reexamination which are filed pursuant to chs. 971 and 975." Sec. 51.20 (17) (g) provides in pertinent part: "Subsections (11) to (14) shall govern the procedure to be used in the conduct of . . . [the reexamination] hearing, insofar as applicable." Sec. 51.20 (14) (g) (renumbered 51.20 (13) (g) by ch. 428, Laws of 1977) in turn, provides in pertinent part:

"If the court determines that the individual is a proper subject for commitment as prescribed in sub. (1) (a), or there is a substantial likelihood, based on the individual's treatment record, that the individual would be a proper subject for commitment under sub. (1) (a) if treatment were withdrawn, it shall order judgment to that effect and continue the commitment. The burden of proof is upon the board or other persons seeking commitment to establish evidence that the subject individual is in need of continued commitment."

The standards for commitment or recommitment under the Mental Health Act (Chapter 51) are set out as follows:

"51.20. **Involuntary commitment for treatment.** (1) PETITION FOR EXAMINATION. (a) Every written petition for examination shall allege that the subject individual to be examined:
"1. Is mentally ill, drug dependent, or developmentally disabled and is a proper subject for treatment; and either
"2. Is dangerous because of:
"a. A substantial risk of physical harm to the subject individual as manifested by evidence of recent threats of attempts at suicide or serious bodily harm; or

"b. A substantial risk of physical harm to other persons as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do such physical harm; or

"3. Evidences a very substantial risk of physical impairment or injury to the subject individual, as manifested by evidence that his or her judgment is so affected that he or she is unable to protect himself or herself in the community and that reasonable provision for his or her protection is not available in the community and the individual is not appropriate for placement under s. 55.06. The subject individual's status as a minor does not automatically establish dangerousness under this subparagraph."

Sec. 51.20 (14) (e) provides:

"(e) All findings of mental illness, need for treatment and dangerousness under this subsection shall be made based on evidence proven beyond a reasonable doubt."

In view of the limitation in the statute of "insofar as applicable" the same as in the statute prior to the 1975 revision and as interpreted by Cook, the present statute is no different than it was in 1973. The standard set by the legislature for recommitment of one who has been previously found not guilty by reason of mental disease or defect is dangerousness.

In *State ex rel. Gebarski v. Milwaukee County Circuit Court*, 80 Wis.2d 489, 259 N.W.2d 531 (1977), involving this same defendant, this court determined that the defendant was entitled to a jury determination of his present mental condition under the provisions of sec. 971.17 (2), Stats. (1975). The court reached this conclusion ". . . because a sec. 971.17 (2) re-examination is to be conducted '. . . as provided in s. 51.20 (17). . . .' Sec. 51.20 (17) (g) provides that '[s]ubsections (11) to (14)

[of sec. 51.20] shall govern the procedure to be used in the conduct of such hearing, insofar as applicable.' One of the included subsections is sec. 51.20 (12), which provides for a jury determination. . ." 80 Wis.2d at 492–493.

A similar argument to defendants was raised in *State v. Hungerford,* 84 Wis.2d 236, 267 N.W.2d 258 (1978), in which a defendant committed under ch. 975, the Sex Crimes Act, urged that the standards for his continued commitment were to be found, not in ch. 975, but in ch. 51.

The defendant in *Hungerford* argued that the legislature intended to provide those committed under the Sex Crimes Act with re-examination hearings substantively identical to those provided persons committed under the Mental Health Act. This parallels the argument made by the defendant in the instant case, except that Hungerford was committed under the provisions of ch. 975, and the defendant Gebarski was committed under the provisions of ch. 971. However, since they both argued that the legislature meant to incorporate by reference the civil commitment standards into their respective statutes, the analysis is essentially the same.

In *Hungerford,* the court said that ". . . it is clear that the legislature did not intend all of the provisions of the civil commitment statute relating to the re-examination of a civilly committed person to apply to hearings for the extension of control over a sexual deviate. Indeed, in sec. 51.20 (17) (g), the legislature said as much: 'Subsections (11) to (14) [which includes the reference to the statutory definition of danger] shall govern the procedure to be used in the conduct of . . . [a reexamination] hearing, insofar as applicable." *Id.* at 250–251.

Thus, the rule of *Gebarski* and *Hungerford* is that the legislature meant to incorporate only so much of the civil

commitment statute referred to in ch. 971 and ch. 975 as is not inconsistent with the terms of those statutes.

In *Hungerford*, this court found it significant that despite the recodification of the Mental Health Act, and amendments to the Sex Crimes Act, the legislature did not change language in Ch. 975 relating to the recommitment of sex offenders which had been previously construed by this court:

The defendant points out that the 1977 legislature enacted ch. 428, sec. 30m, Laws of 1977 to provide:

"51.20(1) (am). If the individual has been the subject of inpatient treatment for mental illness, developmental disability or drug dependency as a result of a voluntary admission or a commitment or placement ordered by a court under this section or s. 55.06 or ch. 971 or 975 immediately prior to commencement of the proceedings, the requirements of specific recent overt acts, attempts or threats to act or pattern of recent acts or omissions may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn."

The defendant argues that this new subsection shows the legislature believed that the sec. 51.20(1)(a) standards with regard to mental illness were to be applied to individuals re-examined under 971.17(2). We conclude, however, that this subsection applies to continued incarceration of one previously found not guilty by reason of mental disease or defect where he has served the time of maximum sentence that could have been applied under sec. 971.17(4), Stats. (1977), which provides:

"971.17. **Legal effect of finding of not guilty because of mental disease or defect.** . . . (4) When the maximum period for which a defendant could have been imprisoned if convicted of the offense charged has elapsed, subject to s. 53.11 and the credit provisions of s. 973.155, the court shall order the defendant discharged subject to the right of the department to proceed against the defend-

ant under ch. 51. If the department does not so proceed, the court may order such proceeding."

We also conclude that it is significant that sec. 971.17 (3) reads the same in 1977 as it did in 1973.[6] This again shows that the legislature intended that the standard on recommitment for those found not guilty by reason of mental disease or defect is the standard of dangerousness.

This court in the first *Gebarski* case at 80 Wis.2d 489, 502 said:

"Inasmuch as we have determined that a defendant may have a jury trial pursuant to sec. 917.17(2), Stats., for re-examination of his mental condition, we deem it appropriate to make some observations in regard to the form of the verdict. The verdict should contain three questions: (1) Whether the defendant should be recommitted to the custody of the department; (2) whether the defendant may be safely discharged; and (3) whether the defendant may be safely released upon such conditions as the court [trial judge] deems necessary. In the event the jury determined the defendant could be safely released upon conditions, it would then be incumbent upon the trial judge to establish the proper conditions of release after giving due consideration to the nature of the evidence presented and the full panoply of options available for release on conditions, and the jury should be so instructed."

This is what the trial court did in this case. We conclude that it did so properly in following the statutes as interpreted by this court.

---

[6] "971.17. **Legal effect of finding of not guilty because of mental disease or defect.** . . (3) If, within 5 years of the conditional release of a committed person, the court determines after a hearing that the conditions of release have not been fulfilled and that *the safety of such person or the safety of others* requires that his conditional release be revoked, the court shall forthwith order him recommitted to the department, subject to discharge or release only in accordance with sub. (2)." (Emphasis added.)

We conclude that the legislature did not intend to impose the civil commitment standards as standards on re-examination of defendants pursuant to sec. 971.17(2).

The next question is: Does failure to instruct the jury that it must find the defendant to be currently mentally ill as well as dangerous result in a denial to the defendant of equal protection of the laws in violation of the federal and state constitutions?

In *State ex rel. Kovach v. Schubert,* 64 Wis.2d 612, 219 N.W.2d 341 (1974), this court held that the automatic commitment of persons found not guilty by reason of insanity constituted a denial to such persons of due process and equal protection of the laws. Until that time, persons maintaining a successful insanity defense to criminal charges were automatically committed without a determination of their present mental condition under the terms of sec. 971.17(1), Stats. (1971).[7] [That provision is unchanged in the 1973 and 1975 statutes.]

The *Kovach* case introduced the "trifurcated trial." The first portion following a plea of not guilty by reason of insanity is devoted to the question of guilt or innocence of the charge. If the defendant is found guilty, the second portion of the trial is to determine whether or not the defendant is not guilty by reason of mental disease or defect. Under *Kovach,* if he is so found, the next determination by that same jury is whether or not the defendant is as of the time of the trial suffering from a mental illness.

The court has said at page 624:

"Because of our ruling herein, the recommended instruction on the effect of a verdict of 'not guilty by reason of mental [disease] [defect] [disease or defect]'

[7] "971.17. **Legal effect of finding of not guilty because of mental disease or defect.** (1) When a defendant is found not guilty by reason of mental disease or defect, the court shall order him to be committed to the department to be placed in an appropriate institution for custody, care and treatment until discharged as provided in this section."

must be modified to reflect the fact that on such a finding the jury will be asked as to whether the defendant is presently mentally ill and whether he is a proper subject for custody and treatment."

In *Kovach* under a caption, "Challenge To Re-examination Procedures," this court says:

"Whereas the provisions of sec. 971.17(2), Stats., spelling out the procedure for a re-examination of a defendant's mental condition, provide for a general procedure following sec. 51.11, neither sec. 971.17 nor ch. 51 designates who has the burden of proof at a re-examination hearing under ch. 51. Normally, the petitioner carries the burden of persuasion in any judicial proceeding so that the burden would be on the defendant to persuade the reviewing court that he could be released.

"There is not denial of equal protection or of due process in placing the burden of showing that a defendant can be released within safety on that defendant, since the burden under sec. 971.17(2) and under sec. 51.11 is the same. It does not shock the conscience to place this burden on this defendant since ch. 51 provides that the court must appoint two psychiatrists to examine the patient who applies for re-examination and thus the patient is not completely without assistance."

While *Kovach* required a present finding of mental illness before a defendant found not guilty by reason of mental disease or defect could be committed to the Department to be placed in an appropriate institution for custody, care and treatment the language makes it clear that the criterion for discharge is whether or not a defendant "can be released with safety." Dangerousness is clearly the standard and not present mental illness. Whereas, *Kovach,* went along with that burden of proof being on the defendant, that position has since been changed and the burden of showing dangerousness is now on the state.

In *Baxstrom v. Herold,* 383 U.S. 107, 111 (1966), the United States Supreme Court stated:

"Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made. *Walters v. City of St. Louis,* 347 U.S. 231, 237. Classification of mentally ill persons as either insane or dangerously insane of course may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given, but it has no relevance whatever in the context of the opportunity to show whether a person is mentally ill at all."

In that case, the court found that there was no basis for denying a jury review to persons civilly committed at the expiration of a penal sentence, when such review was available to all other persons civilly committed.

But the holding in *Baxstrom* is only authority for the proposition that both cases warrant a determination by a jury. That is the law now in this state and even the re-examination under 971.17(2) must be before a jury if the defendant so requests as this court held in the first *Gebarski* case, *supra*. This court in applying the *Baxstrom* rule has stated:

". . . this court must determine whether some rational basis, justifying the difference in the rights afforded these two classes of persons who are alleged to be mentally ill, exists." *State ex rel. Matalik v. Schubert,* 57 Wis.2d 315, 320–21, 204 N.W.2d 13 (1973).

But while this court in *Kovach* extended the right to a jury trial and determination of present mental illness for one convicted of a crime but found not guilty by reason of insanity, it does not follow that one who has been convicted, confined, and then applies for re-examination, must be judged by the same standard by which one merely civilly committed is judged under the statutes. One who has been found, as in the case at bar, to have perpetrated the type of criminal acts that this defendant was found by a jury to have committed and about which there is not the slightest doubt or argument, does not stand in the

same position as one who is committed as mentally ill and as a potential danger to himself or others. The dangerousness of this defendant on the day of the shooting has been amply demonstrated and the question to be decided by a jury or a court sitting without a jury on re-examination is the standard set forth by the legislature in the statutes: Is he presently of danger to himself or others?

In *State ex rel. Farrell v. Stovall,* 59 Wis.2d 148, 207 N.W.2d 809 (1973), this court determined that the civil commitment statutes and the Sex Crimes Laws were virtually identical in purpose and scope, and that persons committed under those respective statutes were so similar as to require a reasonable basis to justify affording greater rights to individuals committed under ch. 51 than to those committed under ch. 975. In that case, the court found no justification for denying the right to a jury trial to persons committed under ch. 975, while according that right to persons committed under ch. 51. However, the court concluded that the fact that a person had been convicted of a sex related crime did provide a reasonable basis for disparity in the judicial re-examination procedures available to ch. 975 committees compared with persons committed under other statutes. This was also the conclusion reached in *State ex rel. Terry v. Schubert,* 74 Wis.2d 487, 501–02, 247 N.W.2d 109 (1976).

Similarly, in *State v. Hungerford, supra,* 84 Wis.2d at 256, this court held that a sex crime conviction provided a rational basis for applying a different standard of dangerousness to one committed under the Sex Crimes Act than to one civilly committed.

We hold that the rationale in *Farrell, Terry,* and *Hungerford* must be applied.

Sec. 971.15 provides:

"971.15. **Mental responsibility of defendant.** (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or de-

fect he lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law."

While the law in its humaneness will not hold a person responsible under such circumstances, one cannot be blind to the fact that the acts were committed by such a person. The fact of having committed such acts certainly showed dangerousness at the time of their commission. On re-examination, our statutes very properly set the standard of dangerousness as the criteria by which eligibility for release or further care and treatment is to be determined.

We find no infringement of either due process or equal protection of the laws in the procedures set forth by 971.17(2) and followed by the trial court in the case before us.

QUESTION #2: DID THE TRIAL COURT ERR IN NOT DISCHARGING THE DEFENDANT AT THE CLOSE OF THE STATE'S CASE ON THE THEORY THAT THE STATE'S CASE LACKED SUFFICIENT PROBATIVE VALUE TO JUSTIFY RECOMMITMENT?

We find this question is moot because the defendant, after having made the motion and having it denied, proceeded to put in a defense.

It has generally been held when a court has the power to direct an acquittal or dismissal of a charge against the accused and has refused to direct a verdict of acquittal at the close of the prosecution's case, the introduction of evidence by the defendant, if the entire evidence is sufficient to sustain a conviction, waives the motion to direct. *State v. Nowakowski*, 67 Wis.2d 545, 557, 227

N.W.2d 697 (1975) ; *Strait v. State,* 41 Wis.2d 552, 668, 164 N.W.2d 505 (1969) ; *State v. Robbins,* 43 Wis.2d 478, 480, 168 N.W.2d 544 (1969).

This point is also discussed in LaFave and Scott, *Criminal Law* (Hornbook Series 1972), Sec. 8, p. 54:

"If the prosecution introduces insufficient evidence to support a conviction, so that the defendant's motion for a directed verdict, made at the close of the prosecution's case, is erroneously denied, but then the defendant, in presenting his own case, himself fills the gap in the prosecution's case, the defendant's renewed motion for a directed verdict, made at the close of his case, is properly denied. This means that a defendant who believes that the prosecution failed to prove a prima facie case is presented with a hard choice. He may present no evidence in his own behalf and thus preserve for appeal the question of whether the trial judge's ruling was erroneous, or else abandon the point by putting in evidence on his side of the case."

See also Comment, *The Motion For Acquittal; A Neglected Safeguard,* 70 Yale L.J. 1151, 1152 (1961) which comments:

"In the criminal trial the efficacy of the defendant's motion for acquittal at the close of the prosecution's case is severely limited by the refusal of almost all appellate courts to review denial of the motion if the defendant later introduced evidence on his own behalf. The accused who chooses to present a defense may of course renew his motion for acquittal after both sides have rested. At that time, however, the trial and appellate court will consider *all* the evidence of guilt in ruling on the motion."

QUESTION #3: WAS THERE SUFFICIENT EVI-
DENCE FOR THE JURY TO FIND AT THE
CONCLUSION OF THE TRIAL THAT THE DE-
FENDANT WAS OF DANGER TO HIMSELF OR
OTHERS?

On November 30, 1973, the defendant had been found guilty of the first degree murder of Karen M. Gebarski,

his wife; guilty of the second degree murder of Kathleen Kurz, her twelve year old sister; guilty of the first degree murder of John G. Dahm, a friend of the family; guilty of attempted murder against Lucille Kurz, mother of Karen and Kathleen; and guilty of endangering safety by conduct regardless of life as to the two murdered women's father, Stanley M. Kurz. At the time of the recommitment hearing, the state put on Mr. Stanley Kurz who testified as to the events on the day of the murder. Karen was the wife of the defendant. They had separated and she had gone to live next door with her parents. On the fatal day, a family friend, John Dahm, had come over to the Kurz' residence and was out in the backyard helping put up a swimming pool for Kathleen. The defendant starting firing into the group working on the swimming pool. Stanley Kurz testified that Gebarski was in an upstairs window next door, when he called Karen's name and then shot her in the right chest. She fell over and Kathy bent over her screaming. Gebarski called out, "Kathy there is one for you" and shot her jaw off, killing her.

The weapon that he used was described as a .308 rifle, an "elephant gun." After killing the two girls, he reloaded and then called out, "John, there is one for you" and shot John Dahm in the head killing him. Mrs. Kurz, who had just returned from the store, heard the screaming in the backyard and she opened the side door toward that house from which he was firing, and Gebarski then called out, "Luce [for Lucille Kurz] here is one for you" and fired at her but missed. He then fired twelve bullets into the house in which the Kurz' lived and then got another rifle and fired seven or eight more shots. The episode lasted from fifteen minutes to a half an hour. When the police arrived and told Gebarski to put down his rifle, he did so and the police then took him away. Mr. Kurz testified that the breakup between his daughter Karen and Gebarski came about as a result of Gebarski's interest in another woman.

The state then put on Mrs. Lucille Kurz, who likewise described the events on that day.

The state then called Dr. Kevin Kennedy, a psychiatrist. He testified that he had testified at the trial of Brian Gebarski in 1973, that he had rendered an opinion with regard to the mental condition of Gebarski at the time of the shootings and that he had found that at the time of the acts, Gebarski was suffering from a mental disease and that the difficulty related to an "acute psychotic reaction;" that Gebarski was suffering, "from a severe and extensive departure from reality;" that "he was very intensely involved in his depression and his misery at the realization of significant changes in his relationship with his wife." He summarized his testimony of 1973 by saying, "Well, my opinion was that Mr. Gebarski was suffering from an acute psychotic reaction, a break with reality which rendered him unable to rationally judge his actions and to understand the right or wrongfulness of his acts and to conform his conduct within the requirements of the law."

Following this testimony, the state rested and the defense then put in its case and first called Dr. Kevin Kennedy. He testified that he examined Gebarski for the purpose of this hearing on January 18, 1978, that he talked to him for forty-five minutes and that it was the first time he had seen Gebarski since 1973. The interview took place in the Milwaukee county jail. He noticed that Gebarski had lost about sixty pounds of weight since he had seen him in 1973. He testified that Gebarski was not suffering from a mental illness, "He has made considerable improvement in his attitude about everything that has happened to him and in that sense there's been a considerable change in his mental status since the 1973 examination."

The doctor testified that Gebarski "indicated that he was in a state of severe depression for approximately one year and one-half after the incident, and, of course had

a great deal of guilt feelings about what had occurred. He's discussed with me his attitude about weapons and his interest in staying completely away from incidents that could cause anything." The doctor testified that he gave no physical or written tests, and that half of the time of the interview, the doctor did the talking. When asked by the court: "Can he suffer another acute psychotic reaction in the future?" The doctor said, "The answer is yes."

The defendant then called Dr. James J. Balistrieri, a psychiatrist, who testified that he examined Gebarski in the county jail on the 18th of January, 1978, that his examination was a psychiatric interview which amounted to talking to Gebarski, that no psychological testing was performed, that he talked to Gebarski for forty to forty-five minutes. He testified that in his opinion there was no indication of mental disorder or disease at the time he examined Gebarski but he stated, "If I were to make a suggestion, I would make the suggestion that he would continue in therapy with somebody, but it would be on an out-patient basis."

When asked, ". . . you have no way of determining whether or not a similar acute psychotic reaction would occur in the future?" the doctor's answer was, "I would have absolutely no way of knowing that." He again stated that Gebarski should continue in therapy. When asked, "Can he under a stress situation suffer another acute psychotic reaction?" the doctor answered, "Yes, it is possible."

The defendant's attorney asked the doctor, "To a reasonable degree of medical certainty, do you believe that it is probable that he will suffer another acute psychotic reaction?" The doctor answered, "I believe that the state can take a number of precautions and safeguards, one being that Mr. Gebarski see someone in therapy. He has been seeing somebody at Winnebago, and apparently the relationship is a positive one for him, so I don't see this

as a negative one. I see this as a positive one. The other one obviously is that he be maintained under supervision. These two—these two safeguards I think would be positive safeguards so that both of them can evaluate his progress, his work history, whether he is getting depressed, not depressed and whether his stresses are building up that he cannot handle."

The doctor testified that it was his opinion that the probability of a recurrence was low but the doctor stated, "The probability obviously has to exist because it occurred previously."

The defense next called Doctor Bernard Schaefer, a physician. He testified that he had examined the defendant for forty-five minutes on January 18, 1978. He testified that the defendant told him that at the time he was separated from his wife, "He was upset about the fact that his wife could not have any children because of having had a hysterectomy. He also said that he was upset about the fact that he had been campaigning for some people who had lost in the election, and he said that finally that when he saw his wife with her boyfriend, who was also his friend, he became extremely upset . . ." He testified that in his opinion Gebarski was not potentially dangerous to himself or to others. He also testified under cross-examination that he had not given Gebarski any tests of any kind, physical or psychological, and that the entire examination was "a psychiatric interview which consisted primarily of talking to him or listening to him, of evaluating his reaction, . . ." The doctor was asked, ". . . isn't it true, doctor that at this time you cannot tell us to a reasonable degree of medical certainty whether or not in the future he will suffer a similar acute psychotic reaction?" The doctor's answer was "No, I couldn't say that with any degree of certainty, no, sir." When asked, "And isn't it true, doctor, that if he were to suffer an acute psychotic reaction similar to the one previously referred to that he would constitute

a danger to others?" to which the doctor answered, "Yes. If he had a recurrence, certainly it would be dangerous." The doctor said that one of the stresses that Gebarski talked about was having campaigned for an unsuccessful candidate or candidates at the time of the election.

Doctor Ralph K. Baker was next called and testified that he specialized in the field of psychiatry. He stated that at the Winnebago Mental Institute where Gebarski was located that he was an associate director of forensic and adult psychiatry, that he was not Gebarski's treatment director, that his relationship was "a supervisory and administrative one over the unit on which he is a patient." He said he had no direct treatment relationship with Gebarski, "more in terms of an evaluation." He said that Gebarski's treating physician was a Doctor Lee but that she was not a psychiatrist but that she had had special training in psychiatry from the staff at the institute. He testified that he had examined Gebarski for a total of about two and one-half hours. When asked if there was some potential for the recurrence of a psychotic reaction in Mr. Gebarski, given the right stresses and circumstances, the doctor's answer was "Yes. There is some potential." When asked whether Gebarski was prepared to deal with the stress of a relationship with a woman, his answer was "Yes. He is prepared to deal with it with the help of a therapist, yes . . . I think that the chances of anything going wrong are extremely low as long as he is able to talk it over with his therapist . . . call up your therapist and say, I've got to talk to you, yes."

The defendant next called Doctor Leigh M. Roberts, a psychiatrist. He examined the defendant on December 28, 1977. He had not known the defendant before the interview and interviewed him for two hours and forty minutes. The doctor testified, "It was my opinion that as of that date that Mr. Gebarski did not have a mental disease in the usual understanding of that term. It was

my opinion that he did have a commonly recognized mental disorder, that is a personality pattern which I would call a compulsive personality."

The doctor was asked, "And it is a fair statement, doctor, that you came to the conclusion that he be required to continue in a treatment relationship with court monitoring of such treatment?" to which the doctor replied, "That would be my recommendation. I believe that treatment is needed, and I believe it very appropriate in view of the gravity of the previous behavior that court monitoring be applied to that, and I would think it not unreasonable if there were such requirements for treatment."

When asked, ". . . you did come to the opinion that it is now relatively safe to release him to community residence?" The doctor replied, "Yes. I would say relatively safe, because anyone who has engaged in the specific very dangerous behavior in which Mr. Gebarski engaged, I think does offer more risk than persons who have never engaged in such behavior. As a result, that degree of risk, I think will be with him the rest of his life."

Another witness called by the defense was Mary Campfield, the librarian at Winnebago who testified that Mr. Gebarski got along very well in his work there.

The jury had a right to accept as much of or as little of this testimony as in its discretion it deemed probative. The testimony most favorable to the verdict was certainly sufficient for the jury to reach the conclusion that the defendant could not be released without being of danger to himself or others.

We conclude from the record that the jury's verdict is supported by the evidence elicited in this case and that we must therefore affirm.

*By the Court.*—Judgment affirmed.